United States Court of Appeals
Fifth Circuit

**F I L E D**

April 6, 2005

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 03-11217

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FREDERICK CHARLES MILLER,

Defendant-Appellant

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before HIGGINBOTHAM, SMITH, and
BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

After embezzling over a million dollars from his employer, Frederick Miller pleaded guilty of one count of conducting a monetary transaction with criminally derived funds and one count of tax evasion; he agreed to the forfeiture of about $950,000 in assets. The district court imposed a sentence of ninety-six months' imprisonment and ordered substantial restitution to Miller's former employer and the IRS. Miller appeals several aspects of the application of the sentencing guidelines and the alleged use of certain admissions in the sentencing decision, and claims that numerous errors were made with respect to restitution. We affirm.

I.

Miller engaged in a scheme to defraud his employer and was indicted on eleven counts: one count of wire fraud, 18 U.S.C. § 1343; five counts of theft from a health care benefit

program, *id.* § 669; and five counts of conducting a monetary transaction with criminally derived funds ("money laundering"), *id.* § 1957. A superseding information charged Miller with tax evasion in the year 2000. *See* 26 U.S.C. § 7201.

Miller was, at various times, chief financial officer of Medical Pathway (an affiliate of Medical Select Management ("MSM")) and a related entity, Harris Methodist Select ("HMS"). He wrote checks drawn from the accounts of HMS and MSM payable to fictitious entities and accounts in HMS's and MSM's names but under his control, and later diverted the funds to his own use. None of this illegally obtained income was declared on his tax returns.

Pursuant to a cooperation agreement and, later, a plea agreement, Miller pleaded guilty of one count of conducting a monetary transaction with criminally-derived funds (in violation of 18 U.S.C. § 1957) and one count of income tax evasion (in violation of 26 U.S.C. § 7201). In exchange for these pleas and agreement to forfeit all embezzled funds, the government moved to dismiss the remaining ten counts.

The presentence report ("PSR") initially concluded Miller's offense level for the money laundering count should be calculated using U.S.S.G. § 2F1.1, the applicable guideline for offenses involving fraud. Using § 2F1.1's base offense level of 6, incorporating the value of the stolen funds (+11), considering the sophisticated means used (+2), the abuse of a position of trust (+2), the presence of more than minimal planning (+2), and taking into account Miller's obstruction of justice (+2), the PSR arrived at an offense level of 25. The PSR also concluded that the tax evasion charge should yield a total offense level of 19. Deter-

mining that the two offenses should not be grouped, a one-level increase was added to the highest offense level, yielding a total of 26.

The government objected, contending that either (1) § 2F1.1 should be used in conjunction with a four-level increase because the offense derived more than $1,000,000 and affected a financial institution, generating an offense level for the first count of 29; or (2) § 2S1.2, the guideline for money laundering crimes, should apply, yielding an offense level of 28. Miller objected, contending that the factual resume to which he stipulated did not constitute fraud, so § 2F1.1 could not apply. In sum, after these objections were raised, the question was whether (before grouping) the total offense level for the first count would be calculated under the fraud guideline (resulting in an offense level of 29) or the money laundering guideline (resulting in a level of 28).

At the sentencing hearing, the court denied credit for acceptance of responsibility and applied an enhancement for obstruction of justice based on attempts to conceal funds after arrest. The court then ruled that the factual resume did not contain the necessary elements to make out a fraud offense; opted to sustain Miller's objection; and rejected the contention that § 2F1.1 applies. Implicitly, therefore, the court adopted the position argued in Miller's objection and articulated by the prosecutor at sentencing that if § 2F1.1 did not apply, then § 2S1.2 or § 2B1.1 would apply, with either one generating an offense level of 28, which, when grouped with the tax offense, yielded 29.

After sustaining Miller's objection, the court called a recess to allow the probation officer to recalculate the total offense level. Notwithstanding this intention, the probation officer could not be located, and the court

eventually imposed sentence without consulting her. The offense level used, 29, was offered by the prosecution, and Miller's counsel agreed that this was the appropriate level, but cautioned, "I did not do the grouping and, once again, it was pretty cursory. I would prefer to have [the probation officer] do the calculation]." The court subsequently ordered Miller imprisoned for 96 months (a sentence within the 87 to 108 months delineated by the guidelines for an offense level of 29).

Miller was also sentenced to a three-year term of supervised release, as a condition of which the court ordered him to make restitution of $1,485,074.24, a large portion of which would be covered by the property Miller agreed to forfeit under the terms of the plea agreement. The restitution is payable immediately, but nonpayment is not a violation of supervised release so long as Miller makes the ordered payments of at least $500 per month during his supervised release.

## II.

Miller alleges a number of errors in the calculation and imposition of restitution. Notwithstanding these arguments on appeal, however, Miller made no objection with respect to any aspect of the restitution order. Accordingly, we review for plain error. *See United States v. Branam*, 231 F.3d 931, 933 (5th Cir. 2000). This standard requires that we find (1) that an error has occurred; (2) that the error is plain; and (3) that it affects a substantial right. *United States v. Olano*, 507 U.S. 725, 732-34 (1993). Nevertheless, even if we find plain error, "we will not exercise our discretion to correct a forfeited error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Branam*, 231 F.3d at 933 (citing *Olano*, 507 U.S. at 735-36).

### A.

Miller complains that the court erred in imposing an unrealistic schedule of payments for the restitution. The Mandatory Victim's Restitution Act requires a court to order restitution irrespective of ability to pay. 18 U.S.C. § 3664(f)(1)(A). In determining the manner and schedule with respect to which restitution will be paid, however, a court must consider, *inter alia*, the defendant's financial resources. *Id.* § 3664(f)(2)(A).

The restitution order, as noted above, mandates as a condition of supervised release that Miller return approximately $1.4 million to his former employer and the IRS. This restitution is payable immediately (and accordingly, a substantial portion will be paid with the proceeds of numerous large forfeitures of property to which Miller agreed), yet Miller's nonpayment will not be deemed a violation of his supervised release so long as he pays in accordance with the conditions of supervised release.[1] Miller avers that the order that restitution is payable immediately is plain error where the court conceded that he is unable to afford both restitution and a fine.

Miller relies exclusively on *United States v. Myers*, 19 F.3d 160, 168-69 (5th Cir. 1999), for his contention that where the record demonstrates that a defendant is not capable of making immediate restitution, the perfunctory reference to the fact that he is unable to pay both a fine and restitution is not sufficient consideration of his ability to pay to justify the restitution schedule. *Myers*, however is readily distinguishable.

---

[1] Miller is required to make monthly payments of at least $500 beginning sixty days after his release from prison.

3

In *Myers*, the court ordered a lump sum payment, in contrast to the monthly restitution payments here. Although the restitution in this case is payable immediately, Miller is not ordered to make full restitution at once. Rather, the forfeiture will commence immediately, and presuming no other property of his materializes between now and his release, he will begin making monthly payments after his release. This schedule, therefore, is not plain error, if it is error at all, in light of the court's consideration of Miller's financial situation evident in its decision that he is unable to pay both restitution and a fine.

### B.

As part of the restitution order, Miller is required to pay the IRS $335,074.24, which ostensibly represents the taxes unpaid on his unreported income for 2000. Miller contends that because he paid $78,808 in taxes for that year, the restitution should be reduced by that amount. Miller reported his taxable income for 2000 as $265,999, with a tax due of $78,808. In reality, counting the embezzled funds, his income was $915,167.52, which would have generated a tax liability of $335,074.24 (the amount that the restitution order mandates be paid to the IRS). Consequently, it is Miller's position that the restitution order should require him to pay only the difference, or $256,266.24.[2]

The government concedes that this was error. It nevertheless maintains that no relief should be afforded because the error was harmless, resulted in no prejudice to Miller, and cannot constitute plain error. In his plea agreement, Miller agreed to pay all restitution

---

[2] Miller also asserts, and we address, *infra*, that no restitution may be properly ordered to the IRS at all.

"arising from all relevant conduct, not limited to that arising from the offenses of conviction alone." Though he pleaded guilty to a charge of evading income tax only in 2000, he omitted embezzled income from his 1998 and 1999 tax returns as well. In those years, he avoided paying $149,136.01 in income taxes. As a result, the court could have ordered significantly more restitution than the $78,808 about which Miller complains. Consequently, the failure to deduct the taxes he did pay in 2000 was not plain error.

### C.

According to Miller, it was plain error for the court to order any restitution to the IRS because, he says, such an order is not authorized by any federal statute. The government responds that such restitution is authorized under several different theories. First, the government contends that the court possesses the power to order restitution as a condition of supervised release. In *United States v. Dahlstrom*, 180 F.3d 677, 686 (5th Cir. 1999), we held that "although restitution may not be directly permitted under § 3663(a), a district court may order restitution within the context of a supervised release" pursuant to 18 U.S.C. § 3583(d). Thus, although the Victim and Witness Protection Act, 18 U.S.C. § 3663, does not expressly cover tax offenses such as that under which Miller was convicted, § 3583(d) authorizes such restitution as a condition of Miller's supervised release.

In response, Miller argues that *United States v. Stout*, 32 F.3d 901, 904 (5th Cir. 1994), limits the court's ability to impose restitution, even as a condition of supervised release, to situations in which the defendant agreed to such restitution as part of a plea agreement. Therefore, Miller contends, because as he did not so agree, § 3583(d) does not apply.

This argument, limiting § 3583(d) to cases in which restitution is agreed to in a plea agreement, is the subject of vigorous debate by the parties. According to the government, *Stout*'s limitation of restitution to cases in which it is agreed to in the plea agreement is limited to cases in which such restitution would otherwise have been foreclosed by statutes that formerly barred restitution for unconvicted offenses.[3] Thus, goes the argument, *Stout* limits restitution, by requiring the plea agreement to allow for it, only in cases in which the harm for which restitution is sought was caused by conduct beyond the counts of conviction. Because Miller pleaded guilty of tax evasion, *Stout*'s limitation is inapplicable.

Miller disputes this logic, concluding that *Stout*'s limitation is wholly unrelated to whether the restitution is sought for unconvicted conduct. Instead, Miller believes that *Stout* stands squarely against any imposition of restitution as a condition of supervised release without the defendant's consent in a plea agreement.

As the government points out, this interpretation of § 3583 and *Stout* would preclude the imposition of restitution as a condition of supervised release in any case in which the defendant goes to trial and is convicted. Yet, nowhere in the statute is such a counterintuitive intention manifest.

We need not resolve that particular dispute. Despite Miller's protestations to the contrary,

---

[3] Congress later changed this situation by allowing restitution based on any harm caused by a scheme, conspiracy, or pattern of criminal activity, even if no harm resulted from the offense to which a defendant pleads guilty. *See* 18 U.S.C. § 3663A(a)(2).

he did give his consent to the restitution. In the plea agreement, he acknowledges that the maximum penalties for both counts to which he pleaded guilty (including tax evasion) include "restitution to victims or to the community, which may be mandatory under the law, and which Miller agrees may include restitution arising from all relevant conduct, not limited to that arising from the offenses of conviction alone . . . ."

Miller contends this section is ambiguous and that all such ambiguities must be resolved in his favor, because the government drafted the agreement. S*ee Spacek v. Mar. Ass'n*SS*I.L.A. Pension Plan*, 134 F.3d 283, 298-99 (5th Cir. 1998). There is, however, no ambiguity. Miller was pleading guilty of, *inter alia*, tax evasion. He agreed that by pleading guilty he recognized that the maximum penalties that might be imposed on him included restitution for all relevant conduct. *Stout* is therefore inapplicable, because Miller consented to the restitution. Ordering restitution was, consequently, not plain error.

### D.

Miller is simultaneously being asked to make restitution to his former employer of $1,150,000 and to the IRS of $335,074.24. According to Miller, this order is plain error because it directs him to make his employer whole, yet he still must pay restitution in the amount of taxes he would have been liable for if he had reported the embezzled fundsSSthe same embezzled funds he is ordered to returnSSon his income tax returns. Once again, however, Miller failed to object and raise this argument with the district court. Under the ensuing plain error standard of review, he cannot prevail.

In the first instance, the argument that Miller makes, although possessing some intuitive

appeal, is a novel one in this circuit. It would therefore be a stretch of language to dub the district court's decision "'obvious,' 'clear,' or 'readily apparent,' [an error that is] so conspicuous that 'the trial judge and prosecutor were derelict in countenancing [it], even absent the defendant's timely assistance in detecting [it].'" *United States v. Dupre*, 117 F.3d 810, 817 (5th Cir. 1997) (quoting *United States v. Calverley*, 37 F.3d 160, 163 (5th Cir. 1994) (en banc )). Absent any precedent directly supporting Miller's contention, it cannot be said that the alleged error was "plain" for purposes of our review.

Furthermore, even if we were to say that such an error is "plain," Miller would not necessarily be entitled to relief. As discussed above, plain error review precludes relief except where the putative error affects a substantial right. *Olano*, 507 U.S. at 732- 34. Even then, "we will not exercise our discretion to correct a forfeited error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Branam*, 231 F.3d at 933 (citing *Olano*, 507 U.S. at 735-36).

Given that the district court was statutorily empowered to impose a fine in addition to restitution, it cannot be that Miller's substantial rights were affected. In the absence of the order mandating restitution to the IRS that Miller seeks to have vacated, the district court could have, and indeed likely would have imposed a fine, making any error harmless.[4] Thus, considering the novelty of Miller's claim (a fact that belies the "plain" nature of the supposed error), coupled with the likely harm-

---

[4] It was only after noting that Miller would not be able to afford both restitution and a fine that the court declined to impose a fine.

less nature of the purported error, we cannot say that the trial court's action was plain error.

E.

Miller contends that the restitution order incorrectly identifies the corporate entity to which restitution is owed. Miller is undeterred by the fact that if the alleged error is corrected and restitution is payable to a different entity, he will still be liable for the same amount of restitution. Apparently, in Miller's eyes, this constitutes plain errorSSan error affecting substantial rights that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732.

The basis of Miller's argument is rooted in the changes in corporate structure that his employer underwent during his tenure. Essentially, according to Miller, although restitution was ordered payable to MSM, only a small portion of the embezzled funds was embezzled from MSM. Instead, Miller contends that he initially was employed by HMS, which was controlled by Harris Methodist Health Systems ("HMHS"), which was in turn owned by Texas Health Resources ("THR"). At the beginning of 1999, allegedly HMHS, and thus THR, divested itself of all interest in HMS, and HMS subsequently became MSM. As part of this transaction, Miller states that THR agreed to assume almost $25 million in liabilities on behalf of HMS. Thus, goes the argument, any embezzlement occurring before the formation of MSM should be payable to THR, not MSM.

The government counters with multiple arguments. According to its first theory, even if restitution was ordered to the wrong entity and "should go to either HMHS or THR because of some contractual obligation, then that is a matter for those parties to determine

6

among themselves." This argument is unpersuasive. If the court truly incorrectly divined the correct victim to which restitution is owed, the dictates of § 3663 would be violated, because under the terms of that section restitution would not be going to the "victim." Perhaps it could be argued that this is not plain error, but forcing private "victims" to litigate, in civil court, the question of who is entitled to the restitution likely affects the integrity and public reputation of the courtSSnot to mention the fact that it is inefficient.

The government next posits that the change from HMS to MSM was merely a name alteration and that no relevant change took place. Additionally, it contends that the PSR, on which the court relied, constituted sufficient evidence for the court to conclude that MSM was due the restitution, and Miller did not present evidence to the contrary.[5] The evidence in the record seems to support Miller's position. According to the PSR, much of the embezzlement took place before the corporate changed took place, so a substantial portion of the restitution would seem properly payable not to MSM, but to THR.

Nevertheless, because Miller would be required to pay the same amount in restitution, regardless of which entity receives it, he cannot show that any error affects *his* substantial rights. As inefficient as it may seem to force the competing entities to sort out this dispute themselves, our scope of review is highly circumscribed where an error is unobjected to, and because neither THR nor MSM is a party to this proceeding, neither can claim that its substantial rights are affected. We therefore affirm the restitution order.

### III.

Miller raises a number of issues with respect to his sentencing. We reject these challenges and affirm the sentence.

### A.

Miller contends that the district court violated Federal Rule of Criminal Procedure 32(d)(1)[6] and U.S.S.G. §§ 6A1.2 and 6A1.3[7] by failing to allow the probation officer to "identify all applicable guidelines" after the court sustained Miller's objection to the use of the fraud guideline as initially suggested in the PSR. Specifically, Miller suggests that the decision to sentence him without benefit of the probation officer's recalculation of the applicable offense level deprived him of a meaningful sentencing hearing and requires a vacatur of his sentence.

---

[5] *See United States v. Londono*, 285 F.3d 348, 354 (5th Cir. 2002) ("In general the PSR bears sufficient indicia of reliability to be considered as evidence by the district court, especially when there is no evidence in rebuttal.").

[6] The rule reads, in pertinent part,

The presentence report must:

(A) identify all applicable guidelines and policy statements of the Sentencing Commission;

(B) calculate the defendant's offense level and criminal history category . . . .

FED R. CRIM. P. 32(d)(1).

[7] These provisions prescribe that "[c]ourts shall adopt procedures for the timely disclosure of the presentence report [and] the narrowing and resolution . . . of issues in dispute," U.S.S.G. § 6A1.2, and that "the parties shall be given an adequate opportunity to present information to the court regarding the factor," *id.* § 6A1.3.

At the outset, there is some dispute as to whether Miller properly objected on this issue. If not, our review is for plain error rather than abuse of discretion.[8]

Apparently the court was aware of Miller's request that the probation officer make the recalculation; therefore the court had an opportunity to correct the alleged error. As Miller points out, requiring him to renew his objection once the court decided to impose sentence without further input would be tantamount to requiring him to continue objecting after the court had ruled (a rule akin to the old requirement of taking exceptions). Miller's counsel communicated to the court, in no uncertain terms, that he would "prefer to have Ms. McMillan," the probation officer, do the calculation. This articulation served the purposes of rule 52(b), which is designed to "provide the trial judge an opportunity to avoid or correct any error." *United States v. Rodriguez*, 15 F.3d 408, 417 (5th Cir. 1994); FED. R. CRIM. P. 52(b). The proper standard of review, therefore, is abuse of discretion.

Even under that standard (more generous than plain error), Miller's argument is meritless. He objected to the guideline used to calculate the applicable offense level in the PSR and instead suggested the use of a different guideline. The court sustained the objection. It is therefore difficult to imagine how any alleged error in procedure could have prejudiced Miller. If the sentence were vacated, on resentencing the probation officer would merely reach the same conclusion that the court correctly reached without benefit of the probation officer's assistance. Any error, therefore, is harmless.

Further, it does not appear that the decision to proceed with sentencing was error at all. Contrary to Miller's assertions, neither the text of rule 32 nor §§ 6A1.2 and 6A1.3, nor our precedents interpreting them, require the court to allow the probation officer to make a recalculation following the sustaining of an objection to the PSR. Rule 32(d), the provision on which Miller most heavily relies, merely requires that the PSR include an identification of all applicable guidelines. Nowhere does the rule indicate that a new PSR must be generated after every decision by the court with respect to those calculations.

In *United States v. Knight*, 76 F.3d 86, 88 (5th Cir. 1996), we held that "at least if the defendant has actual knowledge of the facts on which the district court bases an enhancement or a denial of a reduction, the Sentencing Guidelines themselves provide notice of the grounds relevant to the proceeding sufficient to satisfy the requirements of Rule 32 and U.S.S.G. § 6A1.3." Miller was provided with more than adequate notice of the grounds on which the court would impose sentence. In fact, the main issue of dispute at the sentencing hearingSSthe choice of applicable guideline for the money laundering countSSwas the subject of Miller's own objection to the PSR.

Miller tries to distinguish *Knight* and urges that *United States v. Zapatka*, 44 F.3d 112, 114 (2d Cir. 1994), is more on point. There, the court held that the sentencing procedure was violative of rule 32 and § 6A1.3. Reference to *Zapatka*, however, is unavailing, because there the district court, apparently *sua sponte*, applied a guideline different from than that used in the PSR. *Id.*

[8] *Compare United States v. Henry*, 288 F.3d 657, 664 (5th Cir. 2002) (plain error where no objection) with *United States v. Narvaez*, 38 F.3d 162, 165 (5th Cir. 1994) (application of § 6A1.3 and rule 32(c) reviewed for abuse of discretion).

In stark contrast, here the court sustained Miller's objection to the guideline used in the PSR and utilized the guideline that Miller himself argued should apply. Consequently, the procedures used in this case violated neither the text of rule 32 or the guidelines nor their underlying purpose of giving defendants adequate notice such that there can be "focused, adversarial resolution of the legal and factual issues relevant to fixing Guidelines sentences . . . ." *Burns v. United States*, 501 U.S. 129, 137 (1991).

### B.
#### 1.

Miller avers that he is entitled either to withdraw his plea or to be resentenced before another judge because the district court improperly considered self-incriminating statements made by Miller to government agents. Twelve days after his arrest, Miller entered into a cooperation agreement with the government. The government agreed that no self-incriminating statements made by Miller in the course of his interviews with government agents would be used against him in any trial or sentencing.

This broad proposition, however, was subject to numerous caveats, including the understanding that if Miller made any materially false or misleading statement, all statements could be used against him. The government further agreed that any information provided by Miller would be covered by U.S.S.G. § 1B1.8, which (subject to some exceptions) deems self-incriminating statements made pursuant to a cooperation agreement unusable at sentencing.

Miller made more trouble for himself when he allegedly attempted to communicate with his wife, in code, that she should remove and conceal some $40,000 that was stashed in a safe in their house. In previous interviews with agents, Miller had admitted that some of the stolen money was hidden in two safes in his attic. Yet, when agents arrived to search his residence, only one safe was there. Apparently, Miller's father-in-law then arrived with the other, eventually admitting that Miller's wife had brought him the safe the previous night.

Unbeknownst to Miller, his conversations with his wife, during which he allegedly told her to remove the money, were recorded. When confronted with this fact and shown the inmate call logs, Miller conceded, "It's true . . . okay, it's true."

Faced with these facts, the PSR recommended that an obstruction-of-justice enhancement be applied to Miller's offense levelSSan enhancement to which Miller objected, claiming that he had later abandoned his attempt to conceal the funds. After reviewing the tapes of the conversations, the probation officer concluded that the obstruction-of-justice enhancement was justified. The district court, based on Miller's conduct with respect to the concealed funds, denied a reduction for acceptance of responsibility and applied the obstruction-of-justice enhancement.

#### 2.

Miller claims that his statements regarding the concealed funds are protected by the cooperation and plea agreements and § 1B1.8 and therefore could not be properly considered at sentencing. He further argues that the government cannot now claim that he was in breach of the agreements, because it failed to declare a breach before sentencing. Attempting to preempt the government's inevitable response that the court could have reached the same conclusion without relying on his statements, Miller contends that the record does

not demonstrate that the same information was available absent the statements. He lastly avers that regardless of any prejudice that may or may not have befallen him, relief is warranted because the consideration of the statements was virtually a *per se* violation of the cooperation and plea agreements that requires a remedy.

The government makes a three-pronged response. First, it maintains that there was more than adequate information in the record, independent of Miller's statements, from which the court divined that Miller was not entitled to an acceptance of responsibility reduction (and indeed deserved an obstruction of justice enhancement). Second, the government contends that § 1B1.8 is inapplicable because, by its own terms, it covers only self-incriminating evidence gleaned while the defendant provides information concerning the unlawful activities of *others*. Miller, in contrast, goes the argument, was only admitting to his own misconduct. Lastly, the government posits that the cooperation agreement was breached by Miller's initially false statements regarding the concealed $40,000.

The government's breach argument contains a major weakness. As Miller correctly points out, the government ratified the cooperation agreement after the alleged breach when it tendered the cooperation agreement to the court at Miller's rearraignment. As we held in *United States v. Castaneda*, 162 F.3d 832, 836 (5th Cir. 1998), in the context of non-prosecution agreements the government is prevented by due process considerations from unilaterally determining that a defendant is in breach and nullifying the agreement. At the very least, notice must have been given to Miller that the government considered him in breach, thus giving him the opportunity to debate this issue

to the court.[9] Nevertheless, there is a meaningful difference between this case and *Castaneda* in that Miller did not object, so our review is for plain error.

Regardless of whether Miller breached the agreement, however, the government argues quite correctly that the record is replete with information on which the court could have reached the same conclusions independently of the disputed admissions. Besides averring that the record does not contain such evidence, Miller contends that in the context of the government's failure to honor its agreements, such errors are never harmless and constitute plain error in most cases.[10]

These cases, contrary to Miller's contention, do not establish that a failure to fulfill promises contained in agreements constitutes *per se* plain error.[11] Where, as here, the record contains ample bases for the court to make the same determination regardless of the disputed admissions,[12] it cannot be said that the use of

_____

[9] The obvious counter argument to this, however, is that the government never raised the specter of breach because Miller never objected to the use of his statements. Nevertheless, it would be unjust to say that the government forfeits this argument on appeal where it was not given a meaningful motivation for bringing it in the district court because of Miller's failure to object.

[10] *See*, *e.g.*, *United States v. Wilder*, 15 F.3d 1292, 1301 (5th Cir. 1994).

[11] *See United States v. Goldfaden*, 959 F.2d 1324, 1328 (5th Cir. 1992) ("We thus conclude that a prosecutor's breach of a plea agreement *can* amount to plain error." (emphasis added)).

[12] In addition to the disputed statements, the determination that Miller obstructed justice and did

(continued...)

those admissions constitutes plain error that seriously affects the fairness, integrity, or public reputation of judicial proceedings. This is especially so in Miller's case, where he most certainly breached the agreement, and his own failure to object likely led to the government's not declaring this breach in the district court. Therefore, in contrast to cases such as *Goldfaden*, Miller's sentencing did not constitute plain error.[13]

### C.

Miller avers that his counsel's failure to object to the application of the grouping rules constituted ineffective assistance of counsel in violation of the Sixth Amendment. Specifically, in following the recommendation of the PSR, the court did not group the money laundering offense with the tax evasion offense, the result being a one-level upward adjustment to the offense level for the money laundering offense. Miller did not object.

---

[12](...continued) not accept responsibility could easily have been based on the government's discovery of only one safe, rather than the two Miller reported, at the house. Add to this discrepancy the strange re-appearance of the safe at the hands of Miller's father-in-law, and it is further obvious that the government was well aware something was amiss. The recordings of Miller's phone conversations, on which the probation officer relied in making his recommendation in the PSR, and on which the court, in turn, explicitly relied, make certain that there was ample evidence of Miller's mischievous scheme.

[13] Given our conclusion that any breach of the cooperation agreement by the government was either justified by Miller's own breach or was not plain error because of the substantial amount of additional evidence on which the court relied, we do not reach the government's contention that Miller's statements are not covered by § 1B1.8.

The general rule in this circuit is that claims of ineffective assistance will not be considered on direct appeal "when, as here, it was not raised in the district court, because there has been no opportunity to develop record evidence on the merits of the claim." *United States v. Lampaziana*, 251 F.3d 519, 527 (5th Cir. 2001). Accordingly, we decline the invitation to address Miller's ineffective assistance of counsel claim, and we express no opinion as to its merits.

### D.

Miller asserts that application of the sentencing guidelines violates the Sixth Amendment. This argument was initially grounded in *Blakely v. Washington*, 124 S. Ct. 2531, 2537 (2004), in which the Court ruled unconstitutional the State of Washington's sentencing scheme because it mandated the imposition of sentences based on facts not reflected in the verdict or admitted by the defendant. After briefing and argument had been concluded in the instant case, the Court issued *United States v. Booker*, 125 S. Ct. 738 (2005), explicitly extending the fundamental holding of *Blakely* to the federal sentencing guidelines and declaring that their mandatory nature runs afoul of the Sixth Amendment. Essentially, *Booker* makes the guidelines merely advisory. *See United States v. Mares*, No. 03-21035, 2005 U.S. App. LEXIS 3653, at *17 (5th Cir. Mar. 4, 2005).

Nevertheless, the Court explicitly cautioned that "we expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." *Booker*, 125 S. Ct. at 769. Miller concedes that this standard of review applies.

Before we can reverse based on error not

raised at trial, there must be "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" *Mares*, 2005 U.S. App. LEXIS 3653, at \*23 (quoting *United States v. Cotton*, 535 U.S. 625, 631.[14] The plainness or obviousness of the error is assessed by reference to the law as it exists at the time of appellate consideration.[15] Therefore, in this case, where the sentencing court applied the guidelines and made factual findings that were neither authorized by the verdict nor admitted by the defendant, there is an error that is clear or obvious under *Blakely* and *Booker. See Cotton*, 535 U.S. at 632.

The crucial question, therefore, is whether the error affects Miller's substantial rights. In *Mares*, 2005 U.S. App. LEXIS 3653, at \*27-\*28, we said that "the pertinent question is whether [the defendant] demonstrated that the sentencing judgeSSsentencing under an advisory scheme rather than a mandatory oneSSwould have reached a significantly different result." That is, the plain error standard places the

> burden of proof [on the defendant] and requires "the defendant to show that the error actually did make a difference: if it is equally plausible that the error worked in favor of the defense, the defendant loses; if the effect of the error is uncertain so that we do not know which, if either, side it helped the defendant loses."

*Id.* (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005)).

Because *Booker* renders the guidelines advisory, if we were to remand because of an error under *Booker* the district court would have the discretion to impose the same sentence by giving consideration to the guidelines and the other factors enumerated in 18 U.S.C. § 3553(a). Miller can point to nothing in the record to demonstrate that, operating under an advisory sentencing scheme, the district court *would* have reached a significantly different result. Miller's substantial rights, therefore, have not been affected, and he is unable to show plain error.

AFFIRMED.

---

[14] *See also Olano*, 507 U.S. at 732; *Calverley*, 37 U.S. at 162.

[15] *Cotton*, 535 U.S. at 631-32; *Johnson v. United States*, 520 U.S. 461, 467-68 (1997).