# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-11377

United States Court of Appeals
Fifth Circuit

**FILED**

April 24, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

FARAI MARUNDA,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:14-CR-409-1

Before KING, HAYNES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Farai Marunda was caught with a laptop, software, and prepaid debit cards linked to fraudulent tax returns. He opted not to stand trial and struck a deal with the Government. Under that agreement, he pleaded guilty to just a single count of access device fraud. He nonetheless agreed that the Government could pursue restitution for losses arising from his "relevant conduct," not just the conduct admitted in his guilty plea. The Government followed through and pursued over $3.5 million in restitution. Marunda argued

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-11377

at sentencing that the Government failed to offer sufficient evidence that his conduct caused the losses. Based on the fact and opinion testimony of an Internal Revenue Service agent, the district court disagreed. Now, Marunda appeals. But according to the Government, an obstacle stands in our path to the merits: the appeal waiver in Marunda's plea agreement. Marunda counters that an exception applies. We sidestep this issue and AFFIRM on the merits.

## I.

## A.

In the evening hours of April 24, 2013, Farai Marunda returned to his room at a Motel 6 in Addison, Texas. Addison police officers stationed at the hotel that night smelled marijuana outside the room and decided to investigate. Before they could knock, Marunda emerged from the room. The officers told Marunda that they were investigating the marijuana odor, and Marunda admitted that he had been smoking marijuana in the room. Marunda let the officers into the room and handed over a marijuana cigarette.

While the officers were speaking to others inside the room, Marunda hurried to the bathroom and tried to hide two debit cards. The officers managed to restrain him and seize the debit cards. Inside a briefcase on the bed, they found more marijuana, five thumb drives, two laptops, a wireless hotspot device, debit cards in the names of various people, two blank debit cards, a receipt from WalMart for a prepaid debit card, and a sheet of paper containing personal identifying information for the people on the debit cards. Marunda told the officers that he had bought the briefcase—along with all of its contents—at a pawn shop. When pressed, he could not name the pawn shop or produce a receipt for the briefcase. He later revised his answer, claiming that he had bought the items from a man in Dallas.

What had started as a marijuana investigation evolved into a federal tax-fraud investigation. The Addison Police Department gave the thumb drives

No. 16-11377

and laptops to the Internal Revenue Service ("IRS"). The IRS secured a warrant and searched the devices. In the process, IRS investigators discovered a trove of personal identifying information and tax-preparation software used to file returns for 2010, 2011, and 2012.

One of the software packages, Drake Software, is available only to professional tax preparers. To buy the software, the preparer must apply to become an Electronic Return Originator. Once the IRS approves the application, it assigns an Electronic Filing Identification Number ("EFIN") to the preparer. The IRS uses that number to identify tax returns electronically filed by that particular tax preparer. The EFIN also enables the preparer to buy software from Drake, which in turn requires the preparer to register its EFIN and identifying information with Drake before using the software. Once a professional tax preparer files a return, the taxpayer can choose from a few methods to receive a refund. As relevant here, the refund can be loaded onto a prepaid debit card.

The IRS interviewed the preparers whose EFINs were used to register the Drake software found on Marunda's computer and file returns. Each confirmed that his or her EFIN had been stolen.

**B.**

Based on the IRS's investigation, a grand jury returned an indictment charging Marunda with access device fraud, aggravated identify theft, and conspiracy to commit wire fraud.

Marunda and the Government ultimately negotiated a plea agreement. Under that agreement, Marunda would plead guilty to a single count of access device fraud, in violation of 18 U.S.C. § 1029(a)(2). He acknowledged in the agreement that he owed restitution to the IRS. And he agreed that the amount of restitution would be based on "all relevant conduct," not just the conduct admitted in his guilty plea. Marunda also waived the right "to appeal [his]

3

conviction, sentence, fine and/or order of restitution or forfeiture in an amount to be determined by the district court." The plea agreement carves out several exceptions to that waiver, including any "direct appeal of . . . a sentence exceeding the statutory maximum punishment."

Marunda's Presentence Investigation Report ("PSR") assessed $3,519,925 in restitution. That amount was derived from the investigation of IRS Special Agent Brooke Tetzlaff. For each EFIN in Marunda's possession, Tetzlaff ascertained the number of returns filed, the refunds claimed, and the amounts ultimately paid by the IRS. The PSR summarized her analysis in a table, separated by EFIN and tax year.

Marunda objected to the loss calculation. In his view, it was impossible to tell how many different individuals had filed the returns associated with each EFIN. He claimed that other people or groups could have used the same EFINs to run similar schemes. Moreover, he contended that the Government had offered no evidence that he was involved in filing any fraudulent returns. And there was no evidence, according to Marunda, that he or any co-conspirator was responsible for all of the returns in the table or even that all of the returns were fraudulent. Marunda added that he was in custody in Louisiana from November 2, 2011, to April 3, 2012. Therefore, in his view, he could not have been responsible for any returns filed during that time period.

The Probation Office countered Marunda's objections. When Marunda was arrested, he had debit cards used to buy Drake Software associated with two of the EFINs. In addition, the laptops on which the Drake Software was installed had Marunda's personal files on them, including his resume, pictures, and various falsified forms of identification. Next, the Probation Office asserted that his Louisiana fraud convictions suggested that he was involved in filing fraudulent tax returns. Although some of the returns attributed to him were started during his incarceration, many were revised after his release.

Finally, the probation office explained that, due to time constraints, Tetzlaff was not able to investigate every fraudulent return filed using self-preparation software and likely understated the loss amounts from those returns.

The court held a sentencing hearing, focusing largely on restitution. The Government called Agent Tetzlaff to give sworn testimony. Tetzlaff clarified that for the EFINs hijacked from legitimate tax preparers, she was able to differentiate the fraudulent returns from the legitimate ones "based on the different software usage" and by interviewing victims. She also told the court that there was only one Preparer Tax Identification Number ("PTIN")[1] associated with each EFIN, which suggested that only one person was using each EFIN. When multiple individuals are using a single EFIN, Tetzlaff explained, there are normally multiple PTINs used to filed returns under that EFIN. Based on her experience investigating tax fraud, Tetzlaff opined that it was uncommon for EFINs to be distributed among unrelated fraudsters:

> There's multiple steps within each process to just obtain an EFIN, and then they are also shut down if fraud is expected. Therefore, generally when someone utilizes an EFIN that's working for them and isn't being shut down, they tend to not share that with multiple people.

According to Tetzlaff, if more than one person were using an EFIN, that would indicate that they were working together. She also explained that Drake limits the number of devices on which users can install its software.

The district court overruled Marunda's objections and ordered $3,519,925 in restitution. It found "particularly based on the evidence of the

---

[1] A PTIN "is a number issued by the IRS to paid tax return preparers" that is "used as the tax return preparer's identification number." *Frequently Asked Questions: Do I Need a PTIN?*, IRS (Nov. 27, 2017), https://www.irs.gov/tax-professionals/frequently-asked-questions-do-i-need-a-ptin. An EFIN, by contrast, "is a number issued by the IRS to individuals or firms that have been approved as authorized IRS e-file providers." *Id.* Only an individual can obtain a PTIN, whereas EFINs are issued to firms and individuals. *Id.*

No. 16-11377

special agent, that the loss amounts in [the PSR] are more likely than not correct." Although those amounts were "not 100 percent guaranteed correct," the court noted that the Government only had the "burden of showing that those numbers are more likely than not correct."

Marunda appealed. His counsel at first filed an *Anders*[2] brief and motion to withdraw as counsel. We ordered counsel to file a supplemental *Anders* brief or a brief on the merits addressing whether the statutory-maximum exception allowed Marunda to appeal the restitution order. In response, counsel filed a merits brief and a motion to withdraw the *Anders* brief and motion, which this court granted. With the benefit of briefing from both parties, we turn to the merits of this appeal.

## II.

The parties disagree whether Marunda's plea agreement bars this appeal. Under our caselaw, a restitution award that exceeds the victim's losses is an "illegal sentence." *United States v. Chem. & Metal Indus., Inc.*, 677 F.3d 750, 752 (5th Cir. 2012) (quoting *United States v. Middlebrook*, 553 F.3d 572, 579 (7th Cir. 2009)). Thus, we have held that an appeal waiver with a statutory-maximum exception does not foreclose an appeal of an unsupported restitution award. *See id.*; *see also United States v. Desouza*, 630 F. App'x 339, 340 (5th Cir. 2016) (per curiam).

On appeal, Marunda argues that the district court ordered him to pay restitution without sufficient evidence that his conduct caused the alleged losses. In his view, our precedent allows him to raise such an argument on appeal, notwithstanding the waiver. The Government counters that the waiver bars his appeal because he challenges only the sufficiency of the evidence

[2] *Anders v. California*, 386 U.S. 738 (1967).

6

No. 16-11377

proving that he caused the losses, not the amount of the losses themselves. *See United States v. Frazier*, 644 F. App'x 362, 364 (5th Cir. 2016) (per curiam).

We need not resolve this dispute. An appeal waiver does not deprive us of jurisdiction. *United States v. Story*, 439 F.3d 226, 230 (5th Cir. 2006). Because we can affirm the judgment on the merits, we choose that path instead. *See United States v. Smith*, 528 F.3d 423, 424 (5th Cir. 2008).

## III.

Marunda argues on appeal that the evidence was insufficient to prove that his "relevant conduct" caused the IRS's losses. We disagree.

### A.

We review de novo the legality of a restitution award, *United States v. Maturin*, 488 F.3d 657, 659 (5th Cir. 2007). If the law permits an award, we "review the propriety of a particular award for an abuse of discretion." *United States v. Hughey*, 147 F.3d 423, 436 (5th Cir. 1998). The district court's factual findings in support of the award are reviewed for clear error. *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). "A factual finding is clearly erroneous only if 'based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Teel*, 691 F.3d 578, 585 (5th Cir. 2012)). Even in the absence of express factual findings, "[w]e may affirm . . . 'if the record provides an adequate basis to support the restitution order.'" *Id.* (quoting *United States v. Blocker*, 104 F.3d 720, 737 (5th Cir. 1997) (per curiam)).

### B.

The Mandatory Victims Restitution Act of 1996 ("MVRA") requires defendants convicted of certain crimes to pay restitution to their victims. *See* 18 U.S.C. § 3663A(a)(1). As relevant here, it applies to any "conviction[] of, or plea agreement[] relating to charges for" any property crime under Title 18 of the U.S. Code, "including any offense committed by fraud or deceit." *Id.*

7

§ 3663A(c)(1)(A)(ii). It also applies to any crime "in which an identifiable victim or victims has suffered a . . . pecuniary loss." *Id.* § 3663A(c)(1)(B). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2).

The MVRA usually limits restitution to the victim to actual losses resulting directly from the offense of conviction. *See United States v. Arledge*, 553 F.3d 881, 899 (5th Cir. 2008); *Maturin*, 488 F.3d at 660–61 & n.2. Nonetheless, under the Victim and Witness Protection Act ("VWPA"), the district court "may also order restitution . . . to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3); *see Maturin*, 488 F.3d at 661–62 (citing 18 U.S.C. §§ 3663(a)(3), 3663A(a)(3)). In this case, Marunda agreed that the district court could order "restitution arising from *all relevant conduct*, not limited to that arising from the offense of conviction alone." A defendant may consent to restitution for relevant conduct. *See United States v. Miller*, 406 F.3d 323, 330 (5th Cir. 2005); *accord Maturin*, 488 F.3d at 662.

The burden remains on the Government to demonstrate the amount of the resulting loss. *See* 18 U.S.C. § 3664(e). If the MVRA mandates restitution, the probation officer must prepare a PSR with sufficient information for the court to order restitution. *See* 18 U.S.C. § 3664(a); Fed. R. Crim. P. 32(c)(1)(B), (d)(2)(D). "The district court may adopt the facts contained in a presentence report without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *Smith*, 528 F.3d at 425 (quoting *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)). "Any dispute as to the proper amount . . . of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). Excessive restitution cannot be harmless error. *See Sharma*, 703 F.3d at 323. The Government must prove every penny. *See id.*

No. 16-11377

## C.

The plea agreement in this case relaxes the MVRA's usual limit on the amount of restitution. Thus, the district court could order restitution for any losses arising from "relevant conduct." But any losses not resulting from *Marunda's* "relevant conduct" are outside the scope of the agreement and, by extension, the restitution statutes. This is because the district court can only order restitution "to the extent agreed to by the parties." 18 U.S.C. § 3663(a)(3). Marunda contends on appeal that even if the losses associated with the EFINs are correct, the Government failed to prove that those losses arose from his "relevant conduct," as opposed to the conduct of other fraudsters working independently. Neither the statute nor the plea agreement authorizes ordering Marunda to pay restitution for the wrongdoing of others. *Cf. Paroline v. United States*, 134 S. Ct. 1710, 1729 (2014) ("[D]efendants should be made liable for the consequences and gravity of their own conduct, not the conduct of others.").

The parties agree that the plea agreement assimilated the U.S. Sentencing Guidelines definition of "relevant conduct":

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

No. 16-11377

U.S.S.G. § 1B1.3(a)(1). The accompanying commentary[3] emphasizes that the relevant conduct inquiry focuses "on the specific acts and omissions for which the defendant is to be held accountable . . . , rather than on whether the defendant is criminally liable for [the] offense." *Id*. comment. (n.1).

The Government offered sufficient evidence from which the district court could infer that the losses alleged in the PSR arose from Marunda's relevant conduct. Marunda objected only to the calculation of the loss amount. As a result, the district court could accept the remainder of the PSR as undisputed. *See* Fed. R. Crim. P. 32(i)(3)(A); *Smith*, 528 F.3d at 425.

The evidence in the PSR and at sentencing was, at the very least, sufficient to show that Marunda was involved in filing fraudulent tax returns. There was evidence that Marunda owned and used the laptops and thumb drives: they contained Marunda's resumes, personal pictures, and fake IDs. A search of those laptops and thumb drives uncovered Drake Software, which had been used to file fraudulent returns under stolen EFINs. Debit or credit cards in Marunda's possession had also been used to buy the Drake Software registered using two of the stolen EFINs. Finally, the PSR reported that Marunda had previously been convicted of a similar fraud in Louisiana. That came after officers discovered over 100 prepaid cards with various names, laptops, and a binder of personal identifying information in his car.

Of course, to encumber him with the entirety of the alleged loss, the Government was required to prove that he was, more likely than not, involved in filing all of the fraudulent returns associated with the stolen EFINs. The Government bridged the gap through Agent Tetzlaff's testimony. Teztlaff

---

[3] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. St. Junius*, 739 F.3d 193, 213 n.22 (5th Cir. 2013) (alteration in original) (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)).

opined, based on nearly a decade of experience investigating tax fraud, that either Marunda or a co-conspirator had filed those returns. Tetzlaff observed that there was only one PTIN associated with each EFIN. She thought it unlikely that completely unassociated fraudsters would be using the same combinations of EFINs and PTINs as Marunda to file fraudulent tax returns. Moreover, in her experience, fraudsters did not share EFINs. She explained that it is difficult to get an EFIN in the first place, let alone to maintain it. According to Tetzlaff, EFINs are frequently revoked if fraud is suspected. As a result, when fraudsters find an EFIN that continues to work for them, they do not share it. If more than one person were using an EFIN to file fraudulent returns, that would indicate that they are co-conspirators in Tetzlaff's view.

Although the Government could not link Marunda directly to every false return, the district court could (and did) infer such a link based on Tetzlaff's testimony. The Government need not rely exclusively on direct evidence to reach a preponderance. *See United States v. Myers*, 772 F.3d 213, 220 (5th Cir. 2014); *United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010). Rather, it may lay a foundation with direct evidence and fill in the gaps, as it did here, by supplying the district court a basis from which to make reasonable inferences. On appeal, those inferences, like any other factual finding, are reviewed only for clear error. *See Juarez*, 626 F.3d at 251. On this record, we lack a definite and firm conviction that the Government failed to prove that the alleged losses arose from Marunda's relevant conduct. We therefore cannot conclude that the district court erred by entering a restitution order in the amount of $3,519,925.

## IV.

For the foregoing reasons, we AFFIRM the restitution order.