IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 22, 2008

Charles R. Fulbruge III
Clerk

No. 07-60825
Cons. w/ No. 08-60106

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ROBERT C ARLEDGE

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, DeMOSS, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

In this appeal, Robert Arledge ("Arledge") challenges his conviction for lack of sufficient evidence, alleges that the district court's failure to admit key pieces of evidence deprived him of the ability to present a defense, disputes the admission of evidence related to charges of which he was later acquitted, and maintains that the use of the 2006 Sentencing Guidelines violated the Ex Post Facto Clause of the Constitution. He also challenges the district court's restitution order by asserting that the record did not support the district court's calculation of the amount of "loss," argues that the restitution order violated the Eighth Amendment, maintains that the district court did not take into account

requisite statutory factors, and asserts that the restitution order sets forth an unclear payment schedule. We affirm his conviction and sentence, vacate the restitution order, and remand for further proceedings consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A.    Factual Background

A jury convicted Arledge of conspiracy and fraud for his involvement in filing fraudulent claims to recover from the Diet Drug Qualified Settlement Funds I and II (collectively the "Settlement Fund"), funds set up to compensate victims of the diet drug Fen Phen. In December 1999, a jury awarded five Mississippi plaintiffs $150 million in damages arising from their use of American Home Products's ("AHP") diet drugs Pondimin and Redux, commonly known as Fen Phen. AHP entered into a settlement agreement to pay $399 million to approximately 1500 claimants. This settlement, known now as "Fen Phen I," relied upon the claimants' attorneys to gather proof that their clients had taken Fen Phen. The settlement required these attorneys to submit proof of injury, if any, and releases of AHP from liability to the lead attorney in the Mississippi case, Michael Gallagher ("Gallagher"). Gallagher then submitted the information to a court-appointed administrator, Butch Cothren ("Cothren"), who determined the amount of the claimants' awards based upon predetermined criteria related to each claimant's medical injury. In December 2000, AHP entered into a second settlement, known as "Fen Phen II," in which it agreed to pay $350 million to an additional 1500 claimants. This settlement was processed in the same manner as the Fen Phen I settlement, with the exception that AHP received copies of the proof that each claimant had taken the drugs. Both settlements provided that claims with proof of usage were worth much more than claims without such proof.

Arledge was a lawyer in the law firm of Schwartz & Associates ("S&A") and head of the mass torts section of the firm. Arledge was one of several attorneys across the country who entered into a fee-splitting and referral-fee agreement to recruit clients for both Fen Phen settlements. The settlement agreements provided for a contingency fee of 40%. After deducting expenses and other costs, Gallagher, the lead attorney in the Fen Phen settlement cases, received 37.5% of the attorneys' fees, another law firm, Langston, Frazier, Sweet & Freese, received 37.5%, and S&A received 25%. Arledge and Richard Schwartz ("Schwartz") agreed to split equally the attorneys' fees collected by S&A. Thus, Arledge received 12.5% of the total contingency fee.

AHP, after reviewing the proof of usage provided by claimants in the Fen Phen II settlement, discovered numerous instances where the proof was identical for multiple claimants and where the proof of usage extended beyond the time when the drug was removed from the market. AHP wrote letters to Gallagher on February 12, 2001, and February 15, 2001, identifying eighty-two potentially false claims and directing that those claimants not be paid. All the claims originated from S&A. Gallagher met with Schwartz and Arledge on February 26, 2001, and distributed a list of suspect claims and the related fraudulent documentation. Arledge sent Gallagher a letter on May 18, 2001, notifying Gallagher that he was conducting an independent investigation into the false claims.

B. The Fraud

S&A had employed Greg Warren ("Warren") to solicit clients, obtain the client's proof of usage, and perform various other tasks to assist Arledge in filing claims with the Settlement Fund. Eventually, it was revealed that Warren and a handful of others connected to him manufactured documents to prove that particular claimants used Fen Phen. Warren built a network of people to help

him locate claimants and assist him in preparing false claims, including Regina Green ("Green") and Florine Wyatt ("Wyatt"). Both Green and Wyatt testified that they, with Warren's knowledge, created false records for their friends and family so that they could benefit from the Settlement Fund even though the claimants had not taken Fen Phen. Because AHP paid the claimants more if they had actual proof that they had used Fen Phen, both Wyatt and Green created fraudulent prescriptions to maximize the amount that the claimants could receive from the Settlement Fund.

Warren, Green, and Wyatt solicited the clients, provided them with false documentation indicating that they had used the drugs, and then sent these claims to Arledge. Arledge sent these fraudulent claims to the Settlement Fund. This fraud—which resulted in a loss to the Settlement Fund of $6,710,334.90—formed the basis of the criminal charges filed against Arledge.

C.     Procedural Background

For his participation in the Fen Phen fraud, Arledge was convicted of one count of conspiracy in violation of 18 U.S.C. § 371 (count 1), four counts of mail fraud in violation of 18 U.S.C. § 1341 (counts 2–5), and two counts of wire fraud in violation of 18 U.S.C. § 1343 (counts 6–7). Arledge was found not guilty of one count of wire fraud and sixteen counts of money laundering.

Arledge was sentenced to sixty months' imprisonment for each of counts 1 through 3, to run concurrently, and eighteen months' imprisonment for each of counts 4 through 7, to run concurrently with each other and consecutively with his sentence for counts 1 through 3. This resulted in a total sentence of seventy-eight months' imprisonment. In addition, he was sentenced to three years of supervised release on each of the counts of conviction, to run concurrently, and ordered to pay a $700.00 special assessment. In an Amended

Judgment, he was ordered to pay restitution in the amount of $5,829,344.90 and a forfeiture of $375,000.00.

On February 15, 2008, Arledge filed an appeal of his conviction and later filed an appeal from the restitution order. This court consolidated the appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

### A. Sufficiency of the Evidence

Arledge argues that there was insufficient evidence to sustain a conviction for conspiracy, mail fraud, or wire fraud. He argues, first, that the government did not prove that he knowingly participated in the scheme to defraud, obviating his conspiracy conviction; second, that there was insufficient evidence to prove that the mailings underlying the mail fraud counts were sent pursuant to the scheme to defraud; and third, that the wiring underlying the wire fraud count occurred after the completion of the scheme to defraud. When evaluating the sufficiency of the evidence, we must view the evidence in the light most favorable to the government, and we will sustain the conviction if "a rational trier of fact could have found that each element of the charged criminal offense was proven beyond a reasonable doubt." United States v. Arnold, 416 F.3d 349, 358 (5th Cir. 2005); United States v. Stephens, 779 F.2d 232, 235 (5th Cir. 1985).

### 1. Count 1: Knowing Participation

Arledge was convicted of one count of conspiracy. To sustain a conspiracy conviction under 18 U.S.C. § 371, the government must prove:

> (1) an agreement between two or more person[s] to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more members of the conspiracy in furtherance of the objective of the conspiracy.

United States v. Freeman, 434 F.3d 369, 376 (5th Cir. 2005) (internal quotation marks omitted). Arledge disputes only the second element, which the

government can meet by showing actual knowledge of or deliberate indifference to the scheme to defraud. Id. at 378–79. At trial, the government presented evidence to show that Arledge had actual knowledge of the Fen Phen I fraud and that Arledge was deliberately indifferent to the Fen Phen II fraud.

The primary evidence of Arledge's actual knowledge of the Fen Phen I fraud was testimony from his alleged accomplice, Green. Generally, we "will not disturb (the jury's) verdict [or] weigh the credibility of witnesses." United States v. Garner, 581 F.2d 481, 485 (5th Cir. 1978) (citing United States v. Vomero, 567 F.2d 1315, 1316 (5th Cir. 1978)) (internal quotation marks omitted); see United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976). And while we have expressed some trepidation about relying upon accomplice testimony alone, we have found that a conviction will more easily be upheld if the district court provides the jury with an instruction about the dangers of basing its conviction solely upon uncorroborated accomplice testimony.[1] See United States v. Hinds, 662 F.2d 362, 370 (5th Cir. Unit B Nov. 1981) ("The policy behind the giving of an accomplice instruction is no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity." (internal quotation marks omitted)).

A conviction, especially one accompanied by an accomplice instruction, may be sustained on the uncorroborated testimony of an accomplice so long as "the testimony is not incredible or otherwise insubstantial on its face." United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991) (citing United States v. Carrasco, 830 F.2d 41, 44 (5th Cir. 1987)). Testimony will be found incredible only if it is "unbelievable on its face" or the witness testifies to events that she

---

[1] Here, the district court cautioned the jury that it should treat accomplice testimony with great care and should not convict the defendant based solely upon that testimony unless it believed the testimony beyond a reasonable doubt. Arledge did not challenge this instruction or suggest that it was inadequate in any way.

"physically could not have possibly observed or events that could not have occurred under the laws of nature." Cravero, 530 F.2d at 670.

Green testified that Arledge had actual knowledge of the scheme to defraud the Fen Phen I settlement. The evidence showed that when Green became concerned that she might be caught fabricating the prescriptions and expressed a desire to stop her illegal activity, she contacted Warren. Warren tried to convince Green to continue fabricating the prescriptions, but Green was not assuaged. Warren told Green that he would have Arledge contact her to help reassure her that she would not be caught. Green testified that Arledge persuaded her to continue:

> [Arledge] told me—I may not remember the exact words, but he told me that he had talked to [Warren] and [Warren] told him I was afraid to do any more of the prescriptions because I was afraid I was going to get in trouble. And he said we were—I wasn't going to get in any trouble because like [Warren] said, they were going to box all those files up, put them away, and never be seen again. And like I say, I don't remember the whole conversation, but I remember that he convinced me to go on and do more.

A rational trier of fact could conclude that this testimony was evidence of three things: (1) Arledge knew that the prescriptions Green had created were fabricated; (2) Arledge was in an agreement with Warren and Green to defraud the Settlement Fund; and (3) Arledge's conversation with Green was in furtherance of that scheme to defraud.

Arledge maintains that this evidence alone was not sufficient to support the verdict because the testimony was from an alleged accomplice and the government failed to corroborate Green's testimony with phone records of this conversation or additional testimony. There is no evidence to suggest that Green's testimony was either incredible or insubstantial; Green's testimony was consistent with other evidence adduced at the trial. In fact, Warren confirmed

that Green expressed her concern to him about providing more prescriptions and that he spoke with Arledge about Green's concern.

Next, we examine whether there was sufficient evidence for a rational trier of fact to conclude that, at a minimum, Arledge was deliberately indifferent to the Fen Phen II fraud. To prove deliberate indifference, the government had to prove beyond a reasonable doubt that "(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." United States v. Scott, 159 F.3d 916, 922 (5th Cir. 1998).[2]

We conclude that the evidence showed that Arledge was deliberately indifferent to the fraud that occurred in the Fen Phen II cases. The government provided evidence that Arledge was "subjectively aware of a high probability of the existence of illegal conduct." See Scott, 159 F.3d at 922. As noted above, a rational trier of fact could have concluded that Arledge had actual knowledge of the Fen Phen I scheme—as evidenced by Green's testimony—and that he was aware that Warren had recruited Green. The trier of fact could also infer that Arledge's knowledge of Warren's involvement in the Fen Phen I fraud, specifically Arledge's knowledge that Warren had worked with Green to create fraudulent documents, would have put Arledge on notice to suspect any claims that derived from Warren's recruitment efforts, including Warren's solicitation

---

[2] In opaque terms, Arledge challenges the deliberate indifference jury instruction. His condemnation of the deliberate indifference standard is not sufficient to raise the argument and thus he has waived it. See FED. R. APP. P. 28(a)(9) (requiring an appellant to state its "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); United States v. Lindell, 881 F.2d 1313, 1325 (5th Cir. 1989). Arledge suggests no reason why the deliberate indifference standard should not apply here, when the law is clear that a deliberate indifference instruction can satisfy the "knowingly" element for conspiracy. See, e.g., Freeman, 434 F.3d at 377–79; United States v. Gray, 105 F.3d 956, 967–68 (5th Cir. 1997). The instruction submitted to the jury is modeled on the Fifth Circuit Pattern Jury Instruction, which this court has upheld numerous times. See, e.g., United States v. Nguyen, 493 F.3d 613, 618–19 & n.1 (5th Cir. 2007).

of clients in the Fen Phen II cases. Thus, a rational trier of fact could have concluded that Arledge was aware that there was a high probability that the Fen Phen II claims might also be manufactured.

The government also provided sufficient evidence for a rational trier of fact to conclude that Arledge "purposely contrived to avoid learning of the [fraud]." See id. Despite Arledge's assertions otherwise, there is little evidence that Arledge conducted an investigation of the fraudulent claims, even after one of his employees, Christy Clay, suggested to him that the documents appeared fraudulent. Arledge never reported any fraudulent claims to the Settlement Fund and never uncovered any fraud himself. Instead, he filed these claims despite concerns about their veracity.

A rational trier of fact also could have found that Arledge attempted to cover up the fraud after Gallagher notified him that AHP believed that several of the claims filed by S&A were fabricated. Arledge taped a conversation between Warren and him in which they discussed Warren's role in recruiting claimants. The transcript of that conversation suggests that Arledge prepared his questions to lead Warren to answer them in a manner that would relieve both Warren and him of liability. In every instance, Arledge asked Warren a leading question, requiring only a yes or no answer. When Warren tried to answer in a way that might implicate himself or Arledge, Arledge rephrased the answer to eliminate any liability for both of them.

We therefore hold that there was sufficient evidence for a rational trier of fact to find that the government had proved beyond a reasonable doubt that Arledge was deliberately indifferent to the Fen Phen II fraud.

In sum, viewing the evidence in the light most favorable to the government, there was sufficient evidence to show that Arledge had actual knowledge of the Fen Phen I fraud and was deliberately indifferent to the Fen

Phen II fraud. Accordingly, we hold that there was sufficient evidence to support the conspiracy conviction.

### 2. Counts 2–5: Mailings

Next, Arledge contends there was insufficient evidence that the mailings underlying counts 2–5 were directly related to the execution of the scheme to defraud. A conviction for mail fraud under 18 U.S.C. § 1341 requires proof of "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." United States v. Bieganowski, 313 F.3d 264, 275 (5th Cir. 2002).

The government based the mail fraud charges on four checks for attorneys' fees sent through the mail to Arledge. Each check contained fees stemming from Arledge's representation of Fen Phen claimants. The government has not identified specific instances of fraud that resulted in the attorneys' fees contained in the checks, acknowledging that each check contained fees stemming from legitimate claims. Arledge argues that the government failed to prove the second element of the mail fraud statute—the use of mails to execute the scheme—and that the government's failure to provide a clear nexus between the fees received and the fraudulent claims is fatal to the government's case.

In support, Arledge principally relies upon United States v. Tencer, 107 F.3d 1120 (5th Cir. 1997), in which an owner of a chiropractic clinic was convicted of multiple counts of mail fraud after filing fraudulent claims for services never rendered, id. at 1126–27. In Tencer, we specifically "decline[d] to endorse a broad reading of § 1341's mailing requirement that would relieve the government of the burden of proving that mailings underlying mail fraud counts are related to the fraud being perpetrated." Id. at 1126. We held that the government's failure to produce any evidence that connected the specific checks, upon which the convictions were based, to the fraudulent claims was fatal to the

10

government's case. Id. at 1126–27. In addition, the government, in that case, had failed to explain how the "payment of legitimate claims had furthered the scheme to defraud." Id. at 1126 n.1. Thus, we held that a rational trier of fact could not have found Tencer guilty without evidence that the checks underlying the mail fraud counts contained fraudulent proceeds. Id. at 1127.

Despite this strong language, the Tencer court also noted that "'innocent' mailings can sometimes support mail fraud convictions." Id. (citing Schmuck v. United States, 489 U.S. 705, 714–15 (1989)). In Schmuck, the Supreme Court found that innocent mailings could supply the mailing element for mail fraud and held that "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." Schmuck, 489 U.S. at 715. Thus, the government need only provide sufficient evidence that the innocent or legitimate claims were incidental to an essential part of the scheme to defraud. See id. at 710–11 ("It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot." (internal quotation marks and citation omitted)).

Here the government presented sufficient evidence for the jury to conclude that all claims Arledge submitted were part of the scheme to defraud, because the legitimate claims were used as a smoke screen to conceal the fraudulent ones. The evidence showed that the fraudulent claims were easily identified if laid next to one another. The district court noted that the method of falsifying the documents was

> a rather artless and somewhat simpleminded and easily detectable matter of falsifying prescriptions and medical records by the use of a computer and a copy machine. All you had to do was look at it and see the same form was used time and time and time and time again.

By mixing the nearly identical fraudulent claims with the legitimate ones, Arledge was able to drastically lower the chances of detection. In fact, the sheer

number of claims aided the fraud because the chances of success were increased by virtue of the number of claims that had to be processed. A rational trier of fact could have concluded that the fraud was possible because the legitimate claims hid the clearly fabricated prescriptions.

The scheme to defraud also depended upon the maintenance of a harmonious relationship between Arledge, Gallagher, and the Settlement Fund. We have held that mailings pursuant to a scheme to defraud, which extends over a long period of time and depends upon a good relationship between the victim and the defendant, are often incidental to an essential part of the scheme, thus satisfying the mailing element of the mail fraud offense. See United States v. Mills, 199 F.3d 184, 189–90 (5th Cir. 1999) (holding that a scheme involving the issuance of numerous fraudulent checks over the course of thirteen months was not a one-shot operation and that the success of the venture depended upon the continued harmonious relationship with the victims of the fraud); see also Schmuck, 489 U.S. at 711–12 (upholding a jury verdict because "a rational jury could have concluded that the success of the [defendant's] venture depended upon his continued harmonious relations with, and good reputation among, [the victims]").

A rational trier of fact could have concluded that the concealment of the fraudulent claims allowed Arledge to continue to submit additional fraudulent and legitimate claims. There was testimony from Gallagher that, had he been aware that Arledge was filing false claims, he would not have allowed Arledge to continue to receive any attorneys' fees. Thus, the success of the ongoing fraudulent venture depended upon continued harmonious relations between Arledge and Gallagher. Cf. Schmuck, 489 U.S. at 711–12 ; United States v. Strong, 371 F.3d 225, 230–31 (5th Cir. 2004) (recognizing that mailings which lull the victims of fraud have been found to fall under 18 U.S.C. § 1341—the mail

fraud statute). For these reasons, a rational trier of fact could have found that Arledge used the "innocent" mailings to conceal the "easily detectable" fraud and the mailings were incidental to the scheme to defraud. The government did not have to establish that the checks contained attorneys' fees for fraudulent claims; all of the mailings were essential to the fraud. Accordingly, we hold that there was sufficient evidence to support the mail fraud convictions.

3.    Count 7: Wire Fraud

Arledge also contends that the evidence was insufficient to support a conviction on count 7. Count 7, the wire fraud count, involved the transmission of a fax, sent from Gallagher's office to a paralegal working at S&A, which contained a chart of claimants' names and settlement amounts and a request for releases. These attorney releases had to be sent before Arledge could obtain his share of the attorneys' fees. Arledge maintains that this fax was sent after the scheme to defraud had been completed because the claimants had already been paid. In United States v. Maze, 414 U.S. 395 (1974), the Supreme Court held that a scheme to defraud is complete when "'[t]he persons intended to receive the money had received it irrevocably,'" id. at 400 (quoting Kann v. United States, 323 U.S. 88, 94 (1944)). As far as Arledge was concerned, the scheme was not complete until Arledge received attorneys' fees for his participation in the scheme to defraud. Because a rational trier of fact could have found that there was sufficient evidence that the wirings were sent pursuant to the scheme to defraud, we find that the conviction as to count 7 was proper.

B.    Evidentiary Rulings

Arledge maintains that he was prevented from offering evidence that would have aided his defense. The district court's decision to exclude evidence is reviewed for abuse of discretion, so long as the defendant made a timely objection at trial. United States v. Pace, 10 F.3d 1106, 1115 (5th Cir. 1993). If

13

there is an abuse of discretion, the court then decides whether the exclusion affected a substantial right of the complaining party or was harmless error. United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996). Arledge objected to the exclusion of several defense exhibits; we consider each in turn. We then consider whether the cumulative effect of the exclusions denied Arledge the right to present his defense.

1.      Defense Exhibit 32

The district court excluded Defense Exhibit 32, a multi-page list of names, phone numbers, and addresses titled "Arledge Accepted Cases." The document was produced pursuant to the business record exception to the hearsay rule. See FED. R. EVID. 803(6). David Gaylon, an employee of S&A, verified that the document was a record of regularly conducted activity. However, the defense was unable to provide a witness who could testify to the purpose of the document. In addition, the document contained handwritten notations from two individuals, and some of the names on the list had been scratched out. Arledge argues that the document could have shown that Arledge had refused clients because they failed to provide sufficient proof of usage. In addition, he argues that the district court could have redacted the notations by the unknown second person, which, he argues, would have eliminated any concerns about the trustworthiness of those notations and permitted the jury to examine the rest of the document.

Contrary to Arledge's argument, however, the district court did not abuse its discretion when it refused to admit Defense Exhibit 32. The district court is permitted to exclude documents that "indicate a lack of trustworthiness." FED. R. EVID. 803(6). The document showed only names on a page, and without more testimony, the significance of the document was mere conjecture. In addition, the district court refused to admit the document without testimony identifying

the second set of notations because it was concerned about the document's trustworthiness absent clarifying testimony. Arledge submitted no reason why he failed to present evidence at trial that would have relieved the district court's concerns about trustworthiness, nor has he given us reason to believe that the evidence was inherently trustworthy. Finally, the district court's failure to redact the document sua sponte is not grounds for reversal. See United States v. Dotson, 817 F.2d 1127, 1134 (5th Cir. 1987) (holding that a district court did not abuse its discretion when it did not redact, sua sponte, those portions of a document which were prejudicial to the defense).

2. Defense Exhibit 222

Arledge also challenges the exclusion of Defense Exhibit 222, a document prepared by FBI Agent Bill Stokes ("Agent Stokes"), which contained a table of names of Fen Phen claimants who had falsified documents in order to receive compensation from the Settlement Fund. Arledge asserts that this document established that 60 of the 165 claimants listed were not Arledge's clients. The defense sought to introduce the document to prove that Arledge was not the only lawyer who had represented fraudulent claimants.

The trial court held a sealed hearing outside the presence of the jury to discuss this document. At that hearing, Agent Stokes admitted that the document identified several false claims made by claimants who Arledge did not represent, but he also stated that the document incorrectly identified individuals as having made false claims which later proved to be legitimate. Thus, Agent Stokes stated that this document simply reflected his investigation at that time and was no longer accurate.

The district court is permitted to exclude evidence if it is concerned that the information will mislead the jury or if the evidence is cumulative of argument presented at trial. See FED. R. EVID. 403. Arledge has not provided

15

sufficient reasons for believing that this document was reliable or presented testimony that would call into question Agent Stoke's contention that this was simply an investigatory document that the facts no longer supported. The trial court ordered the government to tell the jury that Arledge had not represented all the fraudulent plaintiffs, which the government did. The defense used this information to its advantage, noting in both the defense's opening and closing statements that other attorneys had represented fraudulent claimants. Accordingly, the district court did not err in its exclusion of Defense Exhibit 222.

### 3. Defense Exhibits 163–165

The defense also sought to introduce evidence that Dennis Sweet ("Sweet"), whose firm received 37.5% of the attorneys' fees in the Fen Phen cases, was the attorney for many fraudulent claimants. The exhibits at issue related to four claims that Cothren, the court-appointed administrator of the Settlement Fund, had denied because he believed that they were fraudulent. Sweet had contested Cothren's denial and the claims had been referred to arbitration, where three were denied and one was approved. The district court refused to allow the defense to introduce exhibits detailing Sweet's representation of fraudulent claimants, finding that the exhibits were irrelevant and so voluminous that they would mislead or confuse the jury.

"[A] judge is permitted to exclude relevant evidence if he finds that its probative value is substantially outweighed by the danger of 'unfair prejudice, confusion of the issues, or misleading the jury.'" Brumley Estate v. Iowa Beef Processors, Inc., 704 F.2d 1351, 1356 (5th Cir. 1983) (quoting FED. R. EVID. 403). Evidence that a similarly-situated attorney had pursued what turned out to be false claims has no bearing on whether Arledge had either actual knowledge of the fraud or was deliberately indifferent to the fraud. That another attorney may also have been engaged in fraud or been deliberately indifferent to fraud

would not eliminate Arledge's liability. The district court therefore did not abuse its discretion when it excluded a large number of documents not directly related to the charges, especially given the court's belief that the evidence would mislead the jury.

### 4. Defense Exhibits 97, 103, and 130–155

Defense Exhibits 97, 103, and 130–155 were copies of the fraudulent claimants' files maintained by Gallagher. The defense sought to introduce these files to prove that Gallagher had, in his files, the same documents that Arledge did. Arledge alleges that the fact that Gallagher saw the files and yet did not detect the fraud would have proved that the fraud was not easily detected and refuted the assumption that, as a lawyer, Arledge must have known of the fraud. In addition, Arledge maintains that Gallagher's job was to screen the claims and that Gallagher's failure to notice the fraud proves that Arledge's similar failure was neither unique nor criminal.

The district court is permitted to exclude evidence that is cumulative of evidence already in the record. See FED. R. EVID. 403; Winans v. Rockwell Int'l. Corp., 705 F.2d 1449, 1456 (5th Cir. 1983) (finding that it was harmless to exclude documentary evidence that was cumulative to direct testimony). Gallagher testified that he received the same documentation as Arledge. He also testified that he had no knowledge of the fraud despite having received the same documentation. Because the same information was introduced through Gallagher's testimony as would have been introduced by the admission of Gallagher's business records, the district court did not abuse its discretion in excluding this evidence as cumulative.

### 5. Cumulative Effect of Exclusions

Arledge maintains that the cumulative effect of these exclusions was to deny him a fair trial. In support of his defense, Arledge argued to the jury that

17

he was not criminally liable because other similarly-situated attorneys had not discovered any fraudulent claims submitted by their clients and that their lack of knowledge was evidence that Arledge also was not aware of the fraud being conducted by his clients. Arledge maintains that the district court's evidentiary rulings prevented him from providing support for this argument to the jury. However, this argument is not relevant to whether Arledge had actual knowledge of the fraud and had knowingly participated in the scheme to defraud; therefore, it was properly excluded. See FED. R. EVID. 402 ("Evidence which is not relevant is not admissible.") As we explained earlier, a rational trier of fact could have found that Arledge had actual knowledge of the Fen Phen I fraud. This actual knowledge put him on notice of the Fen Phen II fraud in a way that other similarly-situated attorneys were not. Therefore, evidence that other similarly-situated attorneys had not discovered the fraud is not relevant to Arledge's actual knowledge of or deliberate indifference to the fraud. Thus, the district court did not abuse its discretion in its evidentiary rulings.

C.      Admission of Evidence Pertaining to Money Laundering Counts

Arledge argues that the district court abused its discretion in admitting evidence of his lavish spending to prove several money laundering charges; the government withdrew some of those counts and the jury acquitted him of the remaining money laundering charges. He asserts that the admission of this evidence resulted in a "spillover" to the rest of the counts against him and thus was highly prejudicial, because jurors likely did not share Arledge's lifestyle and likely found it offensive.

The Supreme Court has recognized that prosecutorial appeals to class prejudice are highly improper and can be prejudicial. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 237–39 (1940). However, the evidence of Arledge's lavish spending was properly admitted to prove the money laundering

counts;[3] thus, we must consider whether there was any spillover to the other counts. "Generally, this court uses the term 'spillover' in discussing whether a district court abused its discretion in denying a motion for severance." United States v. Edwards, 303 F.3d 606, 639–40 & n.20 (5th Cir. 2002) (citing United States v. Holzer, 840 F.2d 1343, 1349 (7th Cir. 1988) ("No rule of evidence is violated by the admission of evidence concerning a crime of which the defendant is acquitted, provided the crime was properly joined to the crime for which he was convicted and the crimes did not have to be severed for purposes of trial. It makes no difference, moreover, whether the jury acquits on some counts or the trial or reviewing court sets aside the conviction.")). Arledge has not asserted that he was improperly denied severance. Instead, Arledge asks for a new trial based on the alleged prejudice arising from the admission of evidence to prove the money laundering charges.

In Edwards, we considered whether evidentiary "spillover from invalid claims can be a basis for granting a new trial." Id. at 639. The court stated that to make such a claim, "[a]t a minimum, . . . defendants must show that they

---

[3] Arledge also asserts that this evidence was inadmissible to prove the money laundering charges, and that its admission violated his due process and fair trial rights. The district court allowed the prosecution to reopen its case after the defense moved to dismiss the money laundering charges based on the prosecution's failure to prove every element of the charges. Arledge maintains that the district court should not have permitted the prosecution to reopen its case to prove the elements of money laundering and that doing so both violated his right to a fair trial and amounted to double jeopardy. A trial court's decision to reopen a case is reviewed for abuse of discretion. United States v. Walker, 772 F.2d 1172, 1177 (5th Cir. 1982); United States v. Wilcox, 450 F.2d 1131, 1143 (5th Cir. 1971); United States v. Duran, 411 F.2d 275, 277 (5th Cir. 1969).

Here, the district court reopened the case to hear testimony to explain documentary evidence already before the jury. The trial court stated, "it is the opinion of this court [that] the information that the government is eliciting from its agent is on the record." The additional testimony was solely for the purpose of assisting the jury to understand the implications of the facts and figures already in the record. The district court did not abuse its discretion in reopening the case when the defense was given a chance to rebut the conclusions of the witness and the testimony was specifically limited to facts already in the record.

experienced some prejudice as a result of the joinder of invalid claims, i.e., that otherwise inadmissible evidence was admitted to prove the invalid fraud claims." Id. at 640. We have stated that Edwards requires the defendant demonstrate both that the "evidence was inadmissible and [that it was] prejudicial." Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1170 nn.18 & 19 (5th Cir. 2006) (citing United States v. Cross, 308 F.3d 308, 319 (3d Cir. 2002) (recognizing that courts must "conduct two distinct inquiries. First, was there a spillover of evidence from the reversed count that would have been inadmissible at a trial limited to the remaining count? Second, if there was any spillover, is it highly probable that it did not prejudice the jury's verdict on the remaining count, i.e., was the error harmless?")). Thus, Arledge must demonstrate prejudice from the introduction of the evidence. See Edwards, 303 F.3d at 640.

Regardless of whether the evidence would have been admitted in a trial solely on the remaining counts, Arledge has failed to prove that the evidence prejudiced him. Arledge has not identified any instances in which the prosecution inappropriately used the evidence of Arledge's wealth or lavish spending to prejudice or bias the jury. See FED. R. EVID. 403 (excluding evidence in which the "probative value is substantially outweighed by the danger of unfair prejudice"); see also id. advisory committee's note (defining "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

In addition, the jury was discerning, despite the introduction of evidence of Arledge's wealth, in its acquittal of Arledge on all the remaining money laundering counts and one count of wire fraud. Arledge was found not guilty on all money laundering counts, demonstrating that the jury did not believe beyond a reasonable doubt that he had participated in any activity that would fall under the statute. The jury's acquittal suggests that it did not allow any potential bias

against Arledge to sway its verdict. See United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (5th Cir. 1989) ("The jury's ability to discern a failure of proof of guilt on some of the alleged crimes indicates a fair minded consideration of the issues."). Arledge has provided no evidence that would suggest otherwise. Accordingly, we find that the jury was not improperly prejudiced and deny Arledge's request for a new trial.

D.    Sentencing

Arledge asserts that the district court's use of the 2006 Sentencing Guidelines violated the Ex Post Facto Clause of the Constitution. U.S. CONST. art. I, § 10, cl. 1. Specifically, Arledge contends that the district court erred in applying the 2006 Sentencing Guidelines rather than the 2001 Sentencing Guidelines for the acts he committed. We review the district court's interpretation of the sentencing guidelines de novo and its findings of fact for clear error. United States v. Washington, 480 F.3d 309, 317 (5th Cir. 2007).

The Ex Post Facto Clause forbids Congress from enacting a law that "'imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" Weaver v. Graham, 450 U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 71 U.S. 277, 325–26 (1866)). In most instances, the Sentencing Guidelines in effect at the time of conviction apply. However, the Guidelines provide that if their application would violate the Ex Post Facto Clause, the court must use the Guidelines in effect on the date the offense of conviction was committed. U.S. SENTENCING GUIDELINES MANUAL § 1B1.11(b)(1) (2006). For the Sentencing Guidelines to apply ex post facto, they must apply to events occurring before their enactment and must disadvantage the offender affected by their application. See Wallace v. Quarterman, 516 F.3d 351, 354 (5th Cir. 2008); see also Miller v. Florida, 482 U.S. 423, 430 (1987).

It is undisputed that the application of the 2006 Sentencing Guidelines rather than the 2001 Sentencing Guidelines disadvantaged Arledge; Arledge received a higher sentence than he would have under the 2001 Guidelines. The critical question for this case is whether Arledge committed any overt acts and thereby extended the scheme to defraud to a time after Congress changed the definition of "loss" in the Sentencing Guidelines on November 1, 2001. Arledge argues that every fraudulent claim was filed with the Settlement Fund before November 2001, and that the only count that alleges any acts after that date was count 7. In so arguing, Arledge incorrectly assumes that the scheme to defraud was complete when the claimants received their settlement payments. As stated above, this court has found that a conspiracy continues until the defendant "realizes fully his anticipated economic benefits." United States v. Girard, 744 F.2d 1170, 1172–73 (5th Cir. 1984).

The government provided evidence that the scheme to defraud continued beyond November 1, 2001. The indictment alleged that at least one overt act, committed as part of the conspiracy alleged in count 1, occurred after November 1, 2001: Overt Act 44 alleged that on January 7, 2002, Arledge caused a $275,000 check to be sent from Gallagher to Arledge for attorneys' fees related to Fen Phen I. Thus, the conspiracy continued at least until January 7, 2002. In addition, Arledge was convicted of one act of wire fraud that occurred after November 1, 2001. Count 7 concerned a fax of a letter enclosing a list of claimants for whom releases were needed to process attorneys' fees. The fax was sent on November 12, 2001. As discussed above, the government presented sufficient evidence for the jury to convict Arledge on count 7. Because Arledge committed at least one overt act and was convicted of one count of wire fraud that occurred after November 1, 2001, the application of the 2006 Guidelines did not violate the Ex Post Facto Clause.

22

E. Restitution

This court reviews the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion. United States v. Adams, 363 F.3d 363, 365 (5th Cir. 2004). Arledge does not dispute that a restitution order was permitted by law; he contests only the amount and schedule of repayment. Accordingly, this court reviews the propriety of this particular award for an abuse of discretion. Id.

Arledge raises three challenges to his restitution order. First, he asserts that the district court miscalculated the amount of loss used to determine the restitution award. Second, he argues that the restitution award is not proportional to the amount of gain he received from his alleged illegal conduct and thus it violates the Eighth Amendment. Finally, he argues that the district court did not properly consider the requisite statutory factors in setting the restitution schedule and that the restitution schedule was ambiguous, leaving too much discretion to the Probation Department to enforce it. We address each challenge in turn.

1. Amount of Loss

The district court ordered Arledge to pay restitution in the amount of $5,829,334.90, without interest, to the Settlement Fund pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A. Arledge disputes the calculation used to determine the amount of loss, claiming that the government did not sufficiently prove that the Settlement Fund had paid false claims arising from Arledge's illegal conduct. Specifically, he objects to the calculation of losses related to the Fen Phen II settlement.

The "general rule is that a district court can award restitution to victims of the offense, but the restitution award can encompass only those losses that resulted directly from the offense for which the defendant was convicted."

United States v. Maturin, 488 F.3d 657, 660–61 (5th Cir. 2007) (citing Hughey v. United States, 495 U.S. 411, 413 (1990)). The pre-sentence report attributed forty-seven fraudulent claims to the offenses for which Arledge was convicted. There were three categories of evidence used to substantiate the government's assertion that these claims resulted from Arledge's illegal conduct: (1) the testimony of Wyatt, an employee of S&A, who created fraudulent documents; (2) the testimony of two pharmacists who testified that specific prescriptions allegedly from their pharmacies were, in fact, manufactured; and (3) representations by AHP that the claims were fraudulent. Arledge and the government agree that the claims identified by Wyatt were part of the count 1 conspiracy; she identified seventeen of the claims totaling $2,192,000.00. Arledge disputes the remaining thirty.

The district court concluded that the evidence presented was sufficient to find that the claims listed in the pre-sentence report were fraudulent. We affirm the district court's finding for all but the three claims discussed below. As to the other claims, there was evidence that the documents were manufactured and false. For eight of the claims, pharmacists Larry Thomas and Cindy Parker provided testimony that the claims were fraudulent. This manufactured evidence, combined with the fact that in all instances Arledge was the attorney of record for the claimants, was enough to indicate a scheme to defraud in the manner described in count 1. AHP identified the rest of the claims as fraudulent, and Arledge was the attorney of record for the claimants. Arledge makes no convincing argument regarding why the identification by AHP is not sufficient or how the district court abused its discretion in relying upon the representations by AHP. Thus, it was not an abuse of discretion for the court to award restitution that encompassed those losses resulting from the creation of

fraudulent documents in furtherance of the scheme to defraud for which Arledge was convicted.

However, there are three claims for which the government concedes that there was no proof of falsity: Florestine Baker ($18,000), Shirley E. Blakely ($18,000), and Lou Savage ($18,000). Without evidence that the claims were fraudulent, it is unclear that the Settlement Fund suffered any loss by paying these claims. The district court's decision to include these three claims, totaling $54,000, without any evidence of fraud was an abuse of discretion.

The government argues that we should disregard this discrepancy because the total amount of these claims, $54,000, is less than 1% of the total restitution order. It also asserts that it would be able to provide, on remand, proof of an additional false claim that was not originally included in the district court's restitution order, which resulted in a loss of $488,000. Accordingly, the government asks this court to find that the failure to provide proof of these three claims was harmless error.

This court has never applied a harmless error analysis to restitution. We have stated repeatedly that an order of restitution must be limited to losses caused by the specific conduct underlying the offense of conviction. See United States v. Griffin, 324 F.3d 330, 367 (5th Cir. 2003) (holding that restitution is restricted to the limits of the offense); Tencer, 107 F.3d at 1135–36. Accordingly, we decline the government's request to adopt a harmless error analysis for the calculation of loss under the MVRA, and we remand for a recalculation of actual loss based upon the evidence in the record.

2. Proportionality

Arledge also asserts that the restitution award violated the Eighth Amendment, because it is disproportionate to require him to pay the full amount of the calculated loss attributable to the fraud when he received only a very

small share of the proceeds from the fraud, estimated to be 12.5% of the total attorneys' fees.

We have held that the amount of the award must be tied to the losses suffered by victims of the defendant's crime, not the defendant's gain from his illegal conduct. See Tencer, 107 F.3d at 1135 ("An order of restitution must be limited to losses caused by the specific conduct underlying the offense of conviction."); United States v. Jiminez, 77 F.3d 95, 99–100 (5th Cir. 1996); see also 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."). Thus, so long as the government proved that the victim suffered the actual loss that the defendant has been ordered to pay, the restitution is proportional. United States v. Butler, 137 F.3d 1371, 1371 (5th Cir. 1998) (per curiam) (citing United States v. Dean, 949 F. Supp. 782, 786 (D. Or. 1996) ("Where the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order.")). The district court need not consider the gain to the defendant by his illegal conduct; only the victim's loss is relevant to the calculation of the restitution award. Here, the award reflects the losses to the Settlement Fund from payments made to fraudulent claimants who participated with Arledge in the scheme to defraud the Settlement Fund. Because the restitution order was tied directly to losses sustained by the victim, it is proportional.

Further, the district court ordered Arledge's restitution award to be "joint and several" with eleven other persons who have already been convicted of fraud related to the Fen Phen I and II settlements. Thus, he may seek contribution from his co-conspirators to pay off the restitution award and reduce the amount he personally owes. The district court's failure to order restitution for others

who might have participated in the scheme is of no consequence. See United States v. Ingles, 445 F.3d 830, 839 (5th Cir. 2006) (finding that "a district court may consider the relative degrees of responsibility of co-defendants in imposing restitution obligations and therefore, the simple fact that like punishment was not imposed on [the co-defendants] does not offend the constitution" (emphasis added) (internal quotation marks and citations omitted)).[4] Accordingly, there is nothing to suggest that the district court abused its discretion or violated the Eighth Amendment when it ordered Arledge to pay the full amount of the victim's loss, subject to the three claims discussed above.

3.    Restitution Schedule

Once a court has set the amount of restitution owed to the victim, it must then provide a schedule for payment of the award, considering the factors listed in 18 U.S.C. § 3664(f)(2). These factors are:

> (A) the financial resources and other assets of the defendant, including whether any of the assets are jointly controlled;
> (B) projected earnings and other income of the defendant; and
> (C) any financial obligations of the defendant; including obligations to dependents.

Id. Because Arledge failed to object to the district court's setting of the payment schedule, we review for plain error. United States v. Miller, 406 F.3d 323, 327 (5th Cir. 2005).

> The repayment schedule provides,
>
> The Court orders immediate payment of $500,000 restitution payable within one month of the date of the filing of this Order. The balance of [$]5,329,334.90 is to be paid immediately and during the

---

[4] Arledge argues that the district court's failure to enhance his sentence with a role-in-the-offense enhancement means that it could not have concluded that Arledge played a large role in the fraud or that his culpability was large enough to justify holding him accountable for the entire loss of the victim. However, he has waived that argument for failure to brief adequately. See FED. R. APP. P. 28(a)(9); Lindell, 881 F.2d at 1325.

period of incarceration, with any remaining balance upon release to be paid in not less than 34 equal monthly installments.

It further provides that upon release from prison, Arledge should make arrangements with the U.S. Probation Office to make monthly payments of $14,000 for a minimum of thirty-four months beginning thirty days after release from imprisonment.

Arledge makes two challenges to the district court's repayment schedule. First, he argues that his financial circumstances do not allow him to make payments according to the repayment schedule.[5] The pre-sentence investigation report alleged that Arledge had assets of over $1 million and a net worth of close to $1 million. The report also stipulated that he had minimal income and large monthly expenses, but that he still had sufficient assets to pay at least partial restitution immediately and to pay monthly installments. The district court explicitly considered this evidence of the defendant's resources and mentioned it all on the record before concluding that the evidence showed that Arledge would have the ability to pay. Accordingly, the district court's decision to require an immediate payment followed by several monthly payments was not plain error.

Second, Arledge argues that the district court's order was internally inconsistent by ordering both immediate repayment of the full amount and repayment in monthly installments after Arledge's period of incarceration. He argues that the Probation Department must reconcile this inconsistency, which

---

[5] Arledge argued in his brief that he provided evidence that

(a) his expenses far exceeded his income; (b) his assets were depleted by the $375,000 forfeiture; (c) he likely would be disbarred for conviction of a felony; (d) he was to serve a 78 month sentence; and (e) it was improbable that he would have any immediate income or any appreciable income in the future.

In addition, he protested that the court below included projected earnings (when he had none) and his assets (a house on which the mortgage exceeded its value).

28

is an improper delegation of the court's authority. This court, in United States v. Albro, 32 F.3d 173 (5th Cir. 1994) (per curiam), found that the district court must designate the timing and amount of payments, id. at 174. In Albro, a probation officer was charged with creating a payment schedule to govern the amount the defendant had to pay in restitution to third parties. Id. We held that such ungoverned delegation affects the defendant's substantial rights and constitutes plain error. Id. at 174 n.1.

Unlike in Albro, the district court in the present case provided explicit instructions for repayment. The district court ordered Arledge to pay $500,000 within one month. The district court also recognized that Arledge may begin repayment while incarcerated, but it did not require any specific amount to be paid immediately beyond the $500,000. Finally, the district court ordered any remaining balance to be paid in not less than thirty-four monthly installments of $14,000 upon release from imprisonment. Because both the timing and the amount of payments was clear on the face of the restitution order, the district court did not delegate the setting of payments to the Probation Office or violate Arledge's substantial rights.

## III. CONCLUSION

We find that there was sufficient evidence to support the jury's verdict as to all counts. We also affirm the district court's rulings on all evidentiary issues and the application of the 2006 Sentencing Guidelines. We hold that the restitution award does not violate the Eighth Amendment and that the repayment schedule was proper. However, we remand for a recalculation of the restitution award consistent with this opinion. Accordingly, we AFFIRM in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.