IRVING, J.,
Concurring in Part, Dissenting in Part:
¶ 33. Williams was convicted of aggravated assault and possession of a knife after having been convicted of a felony. As the majority notes, the State has conceded that Williams’s conviction for possession of the knife should be reversed because of a lack of evidence that the knife he possessed and used in the assault is one that is prohibited by Mississippi Code Annotated section 97-37-5 (Supp.2009). I agree with the State and the majority that Williams’s conviction for possession of the knife should be reversed and rendered. As to the aggravated-assault conviction, the majority finds that this conviction should be reversed and remanded because, in all likelihood, evidence supporting the possession charge prejudicially affected the jury’s deliberation of the aggravated-assault charge. I disagree. I would affirm Williams’s conviction and sentence for aggravated assault. Therefore, I dissent from that portion of the majority’s opinion which reverses Williams’s conviction of aggravated assault.
¶ 34. As stated, in reaching its decision, the majority finds that evidence supporting the possession charge adversely affected the verdict on the aggravated-assault charge. Therefore, I begin with examining the evidence that the majority finds adversely affected the jury’s verdict on the aggravated-assault charge. That evidence is the stipulation, which was agreed to by Williams’s counsel and which reads as follows: “[The] State and [the] defendant agree that [the] defendant is a convicted felon and was a convicted felon on the date in question.” Since Williams’s counsel voluntarily agreed to the admission of the evidence that the majority finds so damaging, it seems to me that Williams should not now be allowed to complain. In fact, it seems to me that he should be procedurally barred, as he created the alleged error of which he now complains. It may be that the State would have proved without the stipulation that Williams is a convicted felon. However, that is not what occurred. Be that as it may, I do not perceive any prejudice to Williams with respect to the aggravated-assault charge.
¶ 35. Williams’s prior felony conviction is for murder. However, as far as I can tell from my perusal of the record, the jury was never told that Williams is a convicted murderer. It seems logical to me that keeping the jury from being apprised of the nature of the prior felony conviction was probably the reason why Williams’s counsel agreed to the stipulation. After having initially engaged in *729 such a maneuver to his advantage, Williams should now be required to accept the full measure of what his counsel’s tactical skills have wrought. This fact notwithstanding, the question remains: where is the prejudice? Again, the jury was not told what Williams had been convicted of.
¶ 36. The majority, relying on a federal case from the Tenth Circuit Court of Appeals, United States v. Parker, 604 F.2d 1327 (10th Cir.1979), finds that Williams’s conviction of aggravated assault must be reversed. First, I note that Parker appears to be at odds with the pronouncement of the Fifth Circuit Court of Appeals on this issue. If we are going to look to the federal courts for guidance on the issue before us, we should look to the United States Supreme Court, and the Fifth Circuit which is the federal circuit court of appeals covering Mississippi. This fact notwithstanding, I also believe that the majority’s reliance on Parker is misplaced. In Parker, the jury was advised of the details of a crime to which the defendant had pleaded guilty. A judgment of guiltiness had been deferred, and the defendant had been placed on probation pursuant to Oklahoma’s Deferred Judgment Act. Id. at 1328. The trial court had ruled that the deferred judgment and sentence were a final conviction for purposes of determining whether the defendant had violated a statute that prohibits a convicted felon from receiving, possessing, or transporting a firearm. Id. The Parker court determined that proceedings under Oklahoma’s Deferred Judgment Act do not constitute a felony conviction for purposes of statutes which prohibit convicted felons from engaging in certain conduct. Id. at 1328-29.
¶ 37. Thus, it is readily apparent that Parker is distinguishable from our case. Here, as stated, the jury was never told of the nature'of the predicate offense, as was the case in Parker. Further, Williams’s prior felony conviction is valid. He is, in fact, a convicted felon, unlike the defendant in Parker.
¶ 38. As noted, the Fifth Circuit has taken a different view of the criteria for determining whether a defendant is entitled to a new trial when “spillover evidence” is involved. In United States v. Arledge, 553 F.3d 881, 895-96 (5th Cir. 2008), the court, quoting United States v. Edwards, 303 F.3d 606, 630-40 & n. 20 (5th Cir.2002), stated that “[gjenerally, this court uses the term ‘spillover’ in discussing whether a district court abused its discretion in denying a motion for severance.” Further, the court noted that:
No rule of evidence is violated by the admission of evidence concerning a crime of which the defendant is acquitted, provided the crime was properly joined to the crime for which he was convicted and the crimes did not have to severed for purposes of trial. It makes no difference, moreover, whether the jury acquits on some counts or the trial or reviewing court sets aside the conviction.
Arledge, 553 F.3d at 895-96 (quoting United States v. Holzer, 840 F.2d 1343, 1349 (7th Cir.1988)). Here, it is not debatable that Williams was properly charged in a single indictment with the crimes of aggravated assault and possession of a knife by a convicted felon. We, as the reviewing court, have set aside Williams’s conviction for possession of a knife by a convicted felon. Thus, the question is whether there is any evidentiary spillover from the possession charge that would justify granting Williams a new trial on the aggravated-assault charge. The Arledge court held that, at a minimum, a defendant must show that inadmissible evidence was admitted to prove the invalid claim and that he experienced some prejudice as a result of the joinder of invalid claims. Id. at 896. *730 Arledge is clear that the defendant must demonstrate prejudice from the introduction of the evidence.
¶ 39. Here, Williams has not demonstrated that the prosecution improperly or inappropriately used the fact that he is a convicted felon to prejudice or bias the jury. There is nothing in this record indicating that the prosecutor suggested to the jury in any manner that it should convict Williams of the aggravated-assault charge because he is a convicted felon. The prosecutor mentioned Williams’s felon status only in connection with the possession charge.
¶ 40. The majority finds prejudice simply because, under Rule 609 of the Mississippi Rules of Evidence, Williams’s felony conviction could not have been used to impeach his credibility because it was more than ten years old at the time of trial. While I agree that under the rule, Williams’s prior felony conviction cannot be used to impeach his credibility, I cannot agree that a statement to the jury that Williams has a prior felony conviction automatically resulted in such prejudice as to deny him a fair trial. Such a conclusion appears at odds with the holding in Ar-ledge, where the court held that the defendant must demonstrate prejudice. If prejudice is to be deemed automatically from the admission of the improper evidence, the requirement that the defendant show prejudice becomes meaningless. Further, such a construction of Arledge prevents the application of the harmless-error analysis. Yet, the Arledge court clearly stated that a trial court must determine whether it is “highly probable that [the spillover evidence] did not prejudice the jury’s verdict on the remaining count, i. e., was the error harmless?” Arledge, 553 F.3d at 896 (quoting United States v. Cross, 308 F.3d 308, 319 (3d Cir.2002)).
¶ 41. The majority, in an effort to demonstrate that Williams suffered prejudice, relies heavily on Williams’s version of what transpired and suggests that the trial was essentially a swearing match between Williams and Walls, the victim. In my view, that is not entirely accurate. Williams produced an alleged eyewitness to the incident, Arthur Love, who testified on direct examination as follows:
Q. And were you a resident of Tunica County back in June the 21st, 2008?
A. Yes.
Q. And I want to call your attention back to that particular day. Do you recall any unusual events that happened that day?
A. Well, I was past Mr. Williams[’s] house, and I come [sic] from the store and I pulled back up in front, of the—
Q. Okay, if I could ask you to slow down, if you can just a little bit, and ' maybe turn — the jurors need to hear you, as well as myself.
A. Okay. So I just pulled back up in front of Old Sub Hot Wings place.
Q. Okay. And then what happened?
A. And I — asking Mr. Williams about takin’ him to the store. By that time he just — everything had broken loose, and he was tryin’ to get inside my passenger side of my truck. And Mr. Walls just kept hittin’ him with a blackjack or som-ethin’. I told him to, “Get away from my truck before y’all break a window.” Already I had a couple windows broken out. But ...
Q. Okay. Then were you in a van?
A. I was — I was sittin’ in the — in the driver’s seat.
Q. Okay. Of this van?
A. Yes, sir.
*731 Q. And- — and—and—and you said that Mr. Williams was with you.
A. He was tryin’ — he was gettin’ ready -to get in my truck, on the passenger’s side.
Q. Okay. Now, while he was trying to get into your truck, what happened?
A. Mr. Walls was whoopin’ him with the blackjack.
Q. Okay. With a blackjack.
A. Mm-hmm.
Q. Now, did you — did you see this for yourself.
A. Yes.
Q. And — and so do you know approximately how many times Mr. Walls hit Mr. Williams?
A. Quite a few times.
Q. Okay.
A. It went on between four and five minutes.
Q. Did it — and Mr. Walls, you’re talking [about] that tall gentleman that stepped on outta here?
A. Yes.
Q. Was beatin’ up on Mr. Williams?
A. Yes!
Q. And what happened after that?
A. Well, I told him to, “Get away from my truck and — before y’all break a window.” And I went to get out and try to stop it. And I did seen [sic] Mr. Williams did like this (indicating), and then he backed off. And I said, “let’s get outta here before someone get hurt.”
Q. Okay. So then you’re sayin’ that after — while Mr. Walls were — -was beatin’ Mr. Williams you got out to go around to try to break 'em up?
A. Right
Q. And when you got around, you saw that Mr. Walls was bleeding.
A Well, I didn’t see him bleedin’. I didn’t actually get all the way around the truck. I just got back in the truck and pulled off.
Q. Okay. And- — but—but he was — he was injured at that point.
A. Right.
Q. Okay. And then what happened after that?
A. Well, we pulled off, and Mr. Walls went, grabbed a piece of cinder block, and go [sic] hit my truck. I stopped and said, “Don’t hit my truck.” So I pulled on. Take [sic] Mr. Williams home.
Q. Okay. So even after Mr. Walls was injured, he was still trying to get to Mr. Williams.
A. Yes.
¶ 42. During cross-examination, Love testified that on the day after the altercation, he found in his van the blackjack that Walls was wielding. According to Love, he gave the blackjack to Williams’s nephew and Williams’s nephew’s wife, who in turn gave it to the Tunica County Sheriffs Department.
¶ 43. Detective Mullen testified that he searched Love’s van the night that the altercation occurred and that he did not find a “slapstick.” He also testified that he examined both of Williams’s hands and did not see any bruises on either of them. He further testified on rebuttal that he did not see any bruises on Williams and that he had photographed only Williams’s right hand because Williams said that was the hand on which he had been hit.
¶ 44. In a further effort to find prejudice, the majority notes that no limiting instruction was given and states that the trial court repeatedly mentioned Williams’s prior felony conviction. It is sufficient to say that Williams’s counsel did not request a limiting instruction, and the trial court *732 did not have an obligation to give one voluntarily. With respect, I must say that I believe the majority’s statement that the trial court repeatedly mentioned that Williams was a convicted felon is inaccurate. I have carefully examined the record, and I cannot find instances of repeated references to Williams’s status as a convicted felon.
¶ 45. It is clear to me, as I suspect it was to the trial judge, that it is highly probable that the “spillover evidence,” which was a simple statement read to the jury that Williams is a convicted felon, did not figure in the jury’s decision to convict Williams of aggravated assault. When the jury considered Williams’s and Love’s testimonies in light of Detective Mullen’s testimony, it is highly probable that it discounted Williams’s self-defense story not because he is a convicted felon, but because his story was contradicted by the lack of physical evidence to support it. It is not rocket science that if one were struck over the hands repeatedly for four to five minutes with a blackjack, there would be severe bruises. Here, there were none.
¶ 46. For the reasons presented, I dissent to that portion of the majority opinion which reverses Williams’s conviction for aggravated assault. I believe that Williams has failed to demonstrate that he has suffered any prejudice from the jury being told that he is a convicted felon.
BARNES, J., JOINS THIS OPINION IN PART AND IN RESULT.