# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2013

Lyle W. Cayce
Clerk

No. 12-31100

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

SHEDRICK O. MCKENZIE,

Defendant – Appellant

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:11-CR-9-1

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

In this Medicare fraud case, Defendant-Appellant Shedrick O. McKenzie challenges the district court's restitution award of $3.0 million and its order that he pay the award immediately, as a lump sum. For the following reasons, we AFFIRM the restitution award, VACATE the district court's order that McKenzie pay the award immediately, and REMAND for consideration of a payment schedule.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-31100

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Shedrick O. McKenzie pleaded guilty to two counts of conspiracy related to a scheme to defraud Medicare.  The charges involved his ownership and operation of McKenzie Healthcare Solutions ("McKenzie Healthcare"), a company that supplied durable medical equipment[1] ("DME") to patients at three locations in Mississippi and Louisiana.  McKenzie admitted that he paid patient recruiters for the names and billing information of Medicare beneficiaries, and for "corresponding prescriptions for medically unnecessary DME, which, when coupled with the Medicare billing information, allowed [McKenzie] to submit false and fraudulent claims through McKenzie [Healthcare] to Medicare."  McKenzie also admitted to paying physicians to refer patients to McKenzie Healthcare to be supplied with DME.  He admitted that, between January 2005 and October 2010, McKenzie Healthcare submitted approximately $9.1 million in claims to Medicare.  Medicare reimbursed McKenzie Healthcare approximately $4.2 million.

The Probation Office determined that the actual amount of loss attributable to McKenzie was the $4.2 million that Medicare paid McKenzie Healthcare.  McKenzie objected that the $4.2 million figure assumed that *all* claims McKenzie Healthcare submitted were fraudulent, when in fact "a significant number" were legitimate.  He asserted that the DME billed to

---

[1] "Durable medical equipment" is defined as:

> [E]quipment, furnished by a supplier or a home health agency that meets the following conditions:
> (1) Can withstand repeated use.
> (2) Effective with respect to items classified as DME after January 1, 2012, has an expected life of at least 3 years.
> (3) Is primarily and customarily used to serve a medical purpose.
> (4) Generally is not useful to an individual in the absence of an illness or injury.
> (5) Is appropriate for use in the home.

42 C.F.R. § 414.202 (2012).

No. 12-31100

Medicare included "oxygen supplies, diabetic supplies, braces and orthotics, as well as the wheelchairs that were a major source of the fraud involved in the prosecution[]." The Probation Office responded that it obtained the $4.2 million figure from Medicare, the victim, and would defer to the district court to make the appropriate determination regarding restitution.

At sentencing, an expert in Medicare billing, Theresa Comeaux, testified on behalf of McKenzie. She testified that she had reviewed an Excel spreadsheet provided by the Government that contained information about all 10,538 claims that McKenzie Healthcare submitted to Medicare between 2005 and 2010. According to Comeaux, the spreadsheet contained data for some claims that were filed multiple times. She said that if Medicare denies a claim initially, providers will sometimes file the same claim a second or third time in an attempt to cure whatever the problem is. However, the spreadsheet was missing data in fields that would have allowed Comeaux to determine if Medicare had denied the claims that appeared multiple times. As a result, she could not determine if McKenzie Healthcare's resubmission of the same claim was in response to a Medicare denial (and, by implication, an attempt to cure a problem with the claim, rather than an attempt to get reimbursed multiple times for the same claim). This "affect[ed the] reliability of the $9.1 million figure" in the PSR.

Comeaux also "reviewed the PSR as it relates [to] the gross paid amount" of $4.2 million. She testified that she did not receive information concerning subsequent adjustments Medicare made to the payments it gave McKenzie Healthcare. She explained that, in the "normal course of business[,] Medicare is in a back and forth relationship with [a] provider," sometimes informing the provider that a previous claim was paid incorrectly and either requesting reimbursement or reducing subsequent payments accordingly. She noted that in reviewing the limited business records for McKenzie Healthcare available

to her, she saw instances where McKenzie Healthcare "had sent money back, and there would be a claims control, or a correspondence control number on the check that they were returning, meaning, there was a back and forth relationship [with Medicare]." Comeaux testified that she did not know how much should be deducted from the $4.2 million to account for adjustment claims. She also did not know by what amount the figures might be "askew" because "we weren't provided the information necessary to make that kind of judgment."

Comeaux testified that other information was missing, as well: some claims in the spreadsheet listed a billed amount of zero, no beneficiary name, no date of birth, or no address. She stated that "the spreadsheet information was very deficient." As a result, she could not determine the reliability of the $4.2 million figure.

John B. Casey, a special agent for the FBI who investigated the case, testified that he interviewed the Medicare beneficiaries who "appeared in the majority of" the claims submitted by McKenzie Healthcare, as well as their primary care physicians. The interviewees stated that the DME provided by McKenzie Healthcare was medically unnecessary. Special Agent Casey testified that the Medicare contractor provided all the data for the case, including the intended and actual loss amounts.

McKenzie's counsel conceded that the Government had made a prima facie showing of a $4.2 million actual loss, but argued that he had rebutted the showing with Comeaux's testimony that the $4.2 million figure did not account for adjustments made by Medicare. The district court noted Comeaux's inability to quantify the amount of the adjustments, but McKenzie argued that the Government bore the burden of proving the loss amount.

The Government agreed that the $4.2 million figure did not accurately represent the actual loss, and called Special Agent Casey to testify a second

time regarding McKenzie Healthcare's bank records. According to Special Agent Casey, between January 2007 and September 2010—only a portion of the conspiracy period, but the time frame for which the Government had McKenzie Healthcare's financial records—$3.1 million in payments from Medicare was deposited into McKenzie Healthcare's bank account. Special Agent Casey noted that the Government did not have records of Medicare payments made during the two years before January 2007.

Considering all the evidence, the district court admitted that it "may be making a stab," but concluded that "this loss is closer to the [$]3.1 million [figure] than it is to the [$]4.2 [million figure]." The court found that the small-value DME items that McKenzie Healthcare billed to Medicare between January 2007 and September 2010 were likely legitimate claims, since such "minor items that didn't rake in the big bucks would hardly be worth th[e] effort" of committing fraud. The court therefore deducted $100,000 from the $3.1 million figure to account for these items, and concluded that the actual loss amount attributable to McKenzie was $3.0 million.

The court ordered restitution in this amount "due immediately," jointly and severally with four co-defendants, but it waived McKenzie's fine after finding that he did not have the ability to pay it. The court sentenced McKenzie to concurrent prison terms of 72 and 60 months, below the guidelines range of 121 to 151 months, along with a two-year term of supervised release. McKenzie timely appealed.

## II.    STANDARD OF REVIEW

"A restitution award is reviewed for an abuse of discretion." *United States v. Crawley*, 533 F.3d 349, 358 (5th Cir. 2008); *see United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012), *cert. denied*, 2013 WL 5507456 (Oct. 7, 2013) (No. 12-1312). A district court abuses its discretion when its ruling is "based on an erroneous view of the law or a clearly erroneous assessment of

the evidence." *Crawley*, 533 F.3d at 358 (internal quotation marks and citation omitted). "District courts are accorded broad discretion in ordering restitution." *United States v. Aubin*, 87 F.3d 141, 150 (5th Cir. 1996).

A court "review[s] de novo the district court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011). "A factual finding is clearly erroneous only if[,] based on the record as a whole, [the court is] left with the definite and firm conviction that a mistake has been committed." *Sharma*, 703 F.3d at 322 (internal quotation marks and citation omitted). This court "may affirm in the absence of express findings if the record provides an adequate basis to support the restitution order." *Id.* (internal quotation marks and citation omitted).

As to the lump sum payment, because McKenzie failed to object to the district court's order, review by this court is for plain error. *See United States v. Arledge*, 553 F.3d 881, 900 (5th Cir. 2008). "To show plain error, [the defendant] must demonstrate that the error was clear or obvious and affected his substantial rights." *Sharma*, 703 F.3d at 322. "'Even if he meets this tough standard, we will not reverse unless the error has a serious effect on the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Barlow*, 568 F.3d 215, 219 (5th Cir. 2009)).

## III.   APPLICABLE LAW

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A–3664, requires a sentencing court to order restitution for a victim's "actual loss directly and proximately caused by the defendant's offense of conviction." *Sharma*, 703 F.3d at 323; *see* 18 U.S.C. § 3663A(a). Actual loss does not "include compensation for that which would have occurred in the absence of the crime. Thus, in health-care fraud cases, an insurer's actual loss for

restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud." *Sharma*, 703 F.3d at 324; *see United States v. Edet*, 2009 WL 552123, *3 (5th Cir. March 5, 2009) (per curiam) ("If Medicare would have been required to pay for the wheelchairs for the beneficiaries even in the absence of [defendant's] criminal offenses, the amounts Medicare paid for the wheelchairs would not be considered an actual loss to Medicare.").

The Government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence. *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998); 18 U.S.C. § 3664(e). However, the defendant bears the burden of proving the amount of any offset, *Sheinbaum*, 136 F.3d at 449, including any amount the victim would have paid in the absence of the fraud, i.e., for medically necessary treatments or DME, *see Sharma*, 703 F.3d at 325–26. The defendant waives any offset claim if he fails to present evidence in the district court of the amount of the offset. *Sheinbaum*, 136 F.3d at 450.

## IV.  DISCUSSION

### A. Restitution Award

McKenzie does not challenge his sentence; he only contests the amount of the restitution award.[2] He argues that the Government failed to prove the restitution amount and that, as a result, the district court abused its discretion in ordering him to pay $3.0 million in restitution. First, he argues that the

---

[2] McKenzie also challenges his ability to pay restitution *at all* because of his financial circumstances, contending that "[t]his court should . . . find that restitution is not warranted," but his argument is foreclosed by the MVRA. 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim *in the full amount of each victim's losses* as determined by the court and *without consideration of the economic circumstances of the defendant*." (emphases added)); *see United States v. Myers*, 198 F.3d 160, 168 (5th Cir. 1999) ("The district court did not err in requiring restitution without inquiring into Myer's financial circumstances.").

$3.0 million restitution award "is not supported by competent evidence" because it is incomplete and "based upon unaudited information supplied from a contractor." Second, he suggests that the $3.0 million figure "fails to include adjustment claims"—when McKenzie Healthcare returned money to Medicare or Medicare withheld subsequent payments—and as a result, "could be off . . . by millions." Finally, McKenzie argues that the Government's data "failed to account for compensation that would have occurred in the absence of a crime."

We are unpersuaded by McKenzie's arguments, and conclude that the district court's restitution award had an adequate evidentiary basis. Information supplied by a victim can provide an adequate evidentiary basis for a restitution award, "[b]ut if a dispute arises, the court must determine by a preponderance of the evidence whether the [information from the victim] actually support[s] the quantum of an award of restitution." *Sharma*, 703 F.3d at 324 n.21; *see also Aubin*, 87 F.3d at 150. "[E]xcessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence." *Sharma*, 703 F.3d at 323.

The $4.2 million figure that the district court began with was provided by Medicare's contractor. McKenzie admitted to receiving $4.2 million from Medicare, and McKenzie's defense counsel conceded that the Government had made a prima facie showing of a $4.2 million loss. Moreover, the district court chose the smaller $3.1 million amount deposited into McKenzie Healthcare's bank account during part of the conspiracy period, rather than the full $4.2 million,[3] and further reduced that number by $100,000 to account for any legitimately-billed DME. Although the district court stated it was "making a stab" at calculating the restitution figure, it "consider[ed] all of the evidence."

---

[3] As the Government notes—calling the restitution amount a "relatively conservative award"—McKenzie also submitted claims during 2005 and 2006, which were not included in the $3.1 million figure.

The district court's final restitution award had ample support in the record. Accordingly, McKenzie's claim that the restitution award was not supported by "competent evidence" fails.

McKenzie's claim that the district court failed to account for adjustments made by Medicare is similarly unconvincing. McKenzie bore the burden of proving the amount of any such offset. *See Sheinbaum*, 136 F.3d at 449 ("Logically, the burden of proving an offset should lie with the defendant."). McKenzie failed to provide credible evidence in the district court to offset the court's calculation of the loss amount. He concedes that his expert was unable to quantify the amount of any adjustments Medicare made. As a result, he waives any offset claim. *See id*. at 450 (finding that defendants waived their offset claim, "having failed to present valuation evidence [of any offset] to the district court").

McKenzie's claim that the district court erred by not accounting for medically necessary DME is also unpersuasive. The Medicare beneficiaries and their primary care physicians who "appeared in the majority of" the Medicare claims submitted by McKenzie Healthcare confirmed that the DME supplied by McKenzie Healthcare was medically unnecessary. This evidence is sufficient to conclude that all, or nearly all, of McKenzie Healthcare's claims were medically unnecessary. McKenzie bore the burden of showing that the loss figure should be reduced by the amount Medicare would have paid in the absence of a crime, i.e., for medically necessary treatments or DME. *Sharma*, 703 F.3d at 325–26; *Edet*, 2009 WL 552123, at *3. He failed to carry this burden. He did not provide evidence that any of the DME at issue was both medically necessary and properly reimbursable under Medicare standards.

The court's analysis of this issue in *Sharma*, a healthcare fraud case about fraudulent billing of pain injections, is analogous. The court in *Sharma* declined to reduce the restitution award for medically necessary injections,

finding that the defendant did not provide any evidence to support such a reduction. 703 F.3d at 326. The court explained:

> The[] [defendants'] plea agreements stated that some injections were provided, but did not represent that those injections were medically necessary or that the physicians would have been reimbursed for them by the insurers. . . . The [defendants] did not produce competent evidence suggesting that even one injection to even one patient was medically necessary and met the insurer's reimbursement standards. Instead, they submitted only the accountant's report which *assumed* without explanation that legitimate and medically necessary injections were performed and would have been reimbursed.

*Id.*; *see also Edet*, 2009 WL 552123, at *3 ("[B]ecause [defendant] only speculates, without having offered evidence below, that some of the wheelchairs might have been legitimately charged to Medicare, the court did not err in finding that the actual loss to Medicare was the total amount that it paid to [defendant] on those claims.").

Similarly, here, McKenzie has not provided evidence to demonstrate that *any* of the reimbursed claims were medically necessary. Instead, he merely speculates that some of the DME was legitimately charged to Medicare. Accordingly, the district court did not abuse its discretion by declining to further reduce the loss amount to account for legitimately billed DME. Since the record does not leave a "definite and firm conviction" that the district court erred in finding that Medicare suffered a loss of $3.0 million, we affirm the amount of the restitution award.

## B. Lump-Sum Payment

We agree with the parties' conclusion that the district court plainly erred by ordering immediate payment, in full, of the restitution award without considering McKenzie's ability to pay. "Once a court has set the amount of restitution owed to the victim, it must then provide a schedule for payment of the award, considering the factors listed in 18 U.S.C. § 3664(f)(2)." *Arledge*,

553 F.3d at 900. These factors are: "(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2).

Here, the PSR reflected that McKenzie collects $150 per month from his ownership of several gumball machines in southern Mississippi, and $2,430 per month in Social Security benefits paid to himself and two of his children due to the death of his first wife. McKenzie is unemployed and last worked from November 2004 through May 2010, when he owned and ran McKenzie Health. McKenzie's home went into foreclosure in August 2010, his total net worth is negative $249,734, and he has eight dependents. The PSR concluded that "[g]iven the defendant's current financial status, and the possibility of a lengthy period of incarceration and significant restitution, it is unlikely that he will be capable of paying a fine." The district court declined to impose a fine, "find[ing] that the defendant does not have the ability to pay" one.

Since the PSR suggested that McKenzie had "absolutely no ability to pay the restitution immediately," the district court plainly erred by ordering immediate payment of the $3.0 million restitution award. *Myers*, 198 F.3d at 169; *see also United States v. Calbat*, 266 F.3d 358, 366 (5th Cir. 2001) (holding that the district court abused its discretion by setting an "unrealistic payment schedule" for a $250,000 restitution award that required repayment over the course of the defendant's three-year prison term and three-year term of supervised release).[4] Accordingly, we vacate in part and remand to the district

---

[4] The court in *Calbat* noted that the "unrealistic payment schedule is particularly troubling in light of the fact that payment of restitution is one of the conditions of Calbat's supervised release. Calbat could thus be sent back to prison for failure to make restitution payments in a timely manner." 266 F.3d at 366. Similarly, here, the PSR provides that

No. 12-31100

court for consideration of a payment schedule pursuant to the factors in § 3664(f)(2). *See Myers*, 198 F.3d at 169 (finding plain error and remanding where the district court ordered immediate payment of $40,256.02 in restitution despite the fact that the PSR concluded the defendant had a negative net worth and no income).

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the restitution award, VACATE the district court's order that McKenzie pay the award immediately, and REMAND for consideration of a payment schedule.

---

"[a]ny unpaid restitution shall become a condition of supervised release, pursuant to 18 U.S.C. § 3583(d)."

12